Jon C. REEVES and Michael
Cavanagh

v.

ALLIANT TECHSYSTEMS, INC.

No. CA 95–237ML.

United States District Court,
D. Rhode Island.

Jan. 29, 1999.

244

Joseph R. Paulumbo, Jr., Palumbo, Galvin & Boyle, Middletown, R.I., for Plaintiff.

William P. Robinson, III, Marc A. Crisafulli, Edwards & Angell, Provdience, R.I., Thomas B. Hatch, Robbins, Kaplan, Miller & Ciresi, Minneapolis, MN, for Defendant.

*MEMORANDUM AND DECISION*

LISI, District Judge.

In May 1995, plaintiffs Jon Reeves and Michael Cavanagh filed suit against defendant Alliant Techsystems, Inc. (Alliant) pursuant to the civil remedy provisions of the Fair Labor Standards Act (FLSA) to recover unpaid overtime compensation. Plaintiffs allege that while Alliant classified them as salaried employees, exempt from the overtime provisions of the FLSA, they were in fact treated as non-salaried employees entitled to overtime compensation. Alliant denies any such violation contending that plaintiffs were paid on a salary basis and therefore, that they were exempt employees under the FLSA. This matter was tried before the court sitting without a jury.[1] Having reviewed the evidence presented at trial and the post-trial memoranda submitted by the parties, this matter is now in order for a decision.

## I. The Parties

### A. Defendant Alliant Techsystems, Inc.

Alliant Techsystems Inc. (Alliant), headquartered in Hopkins, Minnesota, is primarily engaged in the marine and military defense industry, its principal customer being the United States government. Alliant was formed in October 1990 as a spin-off company from Honeywell, Inc. During the relevant time period, Alliant was organized into four business groups—Aerospace, Defense Systems, Emerging Business and Marine Systems. The Marine Systems Group (MSG) had its headquarters in Mukilteo, Washington. Employees of the Engineering Services Center (ESC), a division of the MSG, provided engineering and technical support to the United States Naval Undersea Warfare Center (NUWC). The NUWC is involved in research and development activities relative to the Navy's combat systems.

During the time frame relevant to these claims, the ESC had employees stationed in several locations throughout the United States: Newport/Middletown,[2] Rhode Island; Maryland; Minnesota; Virginia; San Diego, California; Hawaii; and three sites in Washington (Poulsbo, Keyport, and Mukilteo). The ESC headquarters were located in Poulsbo. Each location had a site manager who reported directly to the Director of the ESC, Lee Moraski (Moraski). Jerry Mortaloni (Mortaloni) supervised ESC employees supporting the NUWC Keyport contract until June 1993 when he was succeeded by Larry Armbruster (Armbruster). From 1992 to about December 1993, Tony Misslin (Misslin) supervised ESC employees supporting the NUWC Newport contract; he was succeeded by Robert Griglak (Griglak). Like his Keyport counterpart, the site manager

1. For purposes of judicial economy, this case was consolidated at trial with CA 95–063ML (Reeves I) so that evidence could be presented on both matters at once.

2. Although Alliant's Rhode Island office was actually located in Middletown, the parties at trial and in their pleadings refer interchangeably to Middletown and Newport as the same geographic locale. Despite the fact that Middletown and Newport are two separate municipalities on Aquidnick Island, for purposes of this memorandum the court will follow the parties' references to the site location.

for Alliant's Newport office, Misslin and then Griglak, reported directly to Moraski.

## B. Plaintiffs Reeves and Cavanagh

In 1992, the Navy, as part of its laboratory reorganization, transferred its lightweight torpedo program from San Diego, California to Newport, Rhode Island. In the hope of obtaining a contract from NUWC's Newport division, Alliant established an office in Newport, Rhode Island. Alliant staffed the Newport office with employees who agreed to transfer there on a temporary basis. In 1992, Reeves and Cavanagh were offered temporary assignments to Newport.

Upon acceptance of his temporary assignment to Newport, Reeves was promoted to Chief Engineering Fellow, one of the highest engineering grades within Alliant. In March 1992, Cavanagh also accepted a one year temporary assignment in Newport as Alliant's Senior Principal Customer Service Representative. In this position, Cavanagh was the principal contact with NUWC Newport on contract administration matters.

In December 1993, Reeves accepted a regular assignment in Newport. After only one month in this position, however, Reeves returned to Minnesota, and, for personal reasons, remained there until he was laid off effective April 22, 1996. *See Reeves I,* Order dated January 29, 1999.

In March 1993, Cavanagh also accepted a regular assignment in Newport. Although Cavanagh was laid off effective February 22, 1995, he was paid his full salary until March 31, 1995.

## C. The Opt-in Plaintiffs

The FLSA allows one or more employees to pursue an action in a representative capacity for "other employees similarly situated." 29 U.S.C. § 216(b); *see Basch v. Ground Round, Inc.,* 139 F.3d 6, 10 (1st Cir.1998) (The FLSA "provides for an 'opt in' procedure for class actions, requiring individuals to affirmatively consent to the action in order to be a member of the class."). A section 216 collective action affords plaintiffs "the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact." *Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).

The threshold issue in deciding whether to authorize class notice in a FLSA action is whether plaintiffs have demonstrated that potential class members are "similarly situated." However, neither the FLSA nor its implementing regulations define the term "similarly situated." The First Circuit has not had the opportunity to delineate the appropriate standard for determining whether plaintiffs are "similarly situated," however, several district courts that have considered the question have utilized a two-tiered approach to certification determinations under § 216(b). *See, e.g., Vaszlavik v. Storage Tech. Corp.,* 175 F.R.D. 672, 678–79 (D.Colo.1997); *Brooks v. Bellsouth Telecom., Inc.,* 164 F.R.D. 561, 568 (N.D.Ala. 1995), *aff'd,* 114 F.3d 1202 (11th Cir.1997); *Lusardi v. Xerox Corp.,* 118 F.R.D. 351, 361 (D.N.J.1987); *Allen v. Marshall Field & Co.,* 93 F.R.D. 438, 445 (N.D.Ill.1982).

Under this two-tiered analysis, the trial court must first determine whether notice of the action should be given to potential class members. *See Thiessen v. General Elec. Capital Corp.,* 996 F.Supp. 1071, 1080 (D.Kan.1998) (quoting *Brooks,* 164 F.R.D. at 568). This preliminary pronouncement is "usually based only on the pleadings and any affidavits that have been submitted" during the initial stages of litigation. *Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1214 (5th Cir.1995). Because the court has minimal evidence at the "notice stage," this determination "is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." *Id.; but see, Haynes v. Singer Co., Inc.,* 696 F.2d

884, 887–88 (11th Cir.1983) (district court did not abuse its discretion in refusing to authorize class notice where plaintiff's counsel offered only unsupported assertions of widespread FLSA violations). Courts have held that plaintiffs can meet this burden by simply alleging "that the putative class members were together the victims of a single decision, policy, or plan" that violated the law. *Id.* at 1214 n. 8 (quoting *Sperling v. Hoffman–La Roche, Inc.,* 118 F.R.D. 392, 407 (D.N.J.1988)); *see also Hoffmann v. Sbarro, Inc.,* 982 F.Supp. 249, 261 (S.D.N.Y.1997).

■ Once discovery is complete and the case is ready for trial, the party opposing joinder may file a motion for "decertification." At the "post discovery" stage, the court generally has much more information on which to base its decision, and can make a factual determination on the "similarly situated" question. *See Mooney,* 54 F.3d at 1214. When determining the scope of the class, most courts focus on the following three factors: (1) the disparate factual and employment settings—e.g., whether plaintiffs were employed in the same corporate department, division, and location; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *See, e.g., Thiessen,* 996 F.Supp. at 1081; *Brooks,* 164 F.R.D. at 568; *Lusardi,* 118 F.R.D. at 359. If the record facts reveal that the claimants are not "similarly situated," then the court may decertify the class, and dismiss the opt-in plaintiffs without prejudice. *See Mooney,* 54 F.3d at 1214; *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 51 (3d Cir.1989) (overruled on other grounds). If the plaintiffs are "similarly situated," the district court allows the case to proceed to trial as a collective action. *See Mooney,* 54 F.3d at 1214; *see also Hyman v. First Union Corp.,* 982 F.Supp. 1, 7 (D.D.C.1997) (class members must

only be similarly situated, not identically situated).

■ During the early stages of the instant matter, Plaintiffs Reeves and Cavanagh filed a motion to notify potential class members of the pendency of their action. In support of their motion, Reeves and Cavanagh alleged that they and other potential class members were subject to a series of policies and practices promulgated and enforced by Alliant management, the effect of which was to treat Reeves and Cavanagh as non-exempt employees under the FLSA.[3] In February 1996, Magistrate Judge Robert W. Lovegreen granted Plaintiffs' motion and permitted them to notify present and former ESC "exempt" employees who had supported either the NUWC Keyport or NUWC Newport contract during the relevant time period.

Seven months later, after fifty-six persons had "opted-in" and extensive discovery had been conducted, Alliant filed a motion to restrict joinder—or in other words, to "decertify" certain members of the putative class. Although the case was clearly beyond the "notice stage," discovery had not yet concluded. *See Thiessen,* 996 F.Supp. at 1081 (confronting a similar procedural posture, the court adopted an "intermediate" approach in analyzing the "similarly situated" status of certain opt-ins).

In its motion, Alliant tried to distinguish Reeves and Cavanagh from opt-in plaintiffs who had suffered an actual deduction in pay, who were paid on an hourly basis, or who had terminated their employment outside of the two-year statute of limitations. In a supplemental memorandum, Alliant stated that "the Armbruster disciplinary procedure was applicable only to Keyport employees," but provided no factual support for this assertion. Def.'s Supp. Mem. Supporting Mtn. Restrict

---

**3.** Among these policies was the "Armbruster Memorandum" written and issued by Larry Armbruster on or about July 20, 1993. Issued to ESC Exempt employees in the Pouls-

bo office, the Armbruster Memorandum set forth a three stage disciplinary process to enforce the 45 hour workweek. *See* Def.'s Ex. 29.

Jndr. at 3. In turn, Plaintiffs argued that the Armbruster memorandum was circulated at the highest levels of ESC so that it should be considered an Alliant policy and practice. Finding a sufficient factual nexus between the named plaintiffs and the opt-in plaintiffs, Magistrate Judge Lovegreen denied Alliant's motion with respect to 55 of the 56 opt-ins.[4]

Alliant appealed Magistrate Judge Lovegreen's Memorandum and Order dated April 15, 1997. Without providing additional facts to bolster its argument, Alliant repeated its stance: the Armbruster disciplinary process was applicable only to Keyport employees and not to Newport employees. *See* Def.'s Obj. to Mem. & Order at 6. Alliant averred that the claims and defenses applicable to Newport and Keyport operations employees were "fundamentally different," yet failed to delineate such distinctions. *Id.* at 7.

In response, Plaintiffs highlighted certain language in the Armbruster memorandum. Under the category of "Applicability," the memorandum listed "All ESC employees who are exempt time reporting (contract or burden)." Def.'s Ex. 29; *see* Pls.' Obj. to Def.'s Obj. to Mem. & Order at 9. Citing the memorandum's addressees which included "T. Misslin," the then Newport site manager, Plaintiffs stated that this "document was widely disseminated throughout ESC . . ." *Id.* at 9–10.

On January 14, 1998, this court affirmed Magistrate Judge Lovegreen's preliminary order and provisionally certified the collective action without prejudice to raising issues of Plaintiffs' "similarly situated" status following the completion of discovery.

At the close of discovery, Alliant filed a motion *in limine* to exclude any evidence pertaining to the Armbruster memorandum and renewed its motion to restrict the joinder of any Keyport opt-in plaintiffs. Citing the deposition testimony of Moraski

and Misslin, Alliant stated that the Armbruster memorandum applied to Keyport, not Newport employees. Alliant also argued against the admissibility of the Armbruster memorandum, by stating that Griglak, the Newport site manager, had never issued a similar policy in his department. *See* Def.'s Mtn. *In Lim.* at 5. Again, Alliant attempted to undermine the Plaintiff's "similarly situated" status on the bases of their "job requirements" and "pay provisions." *Id.* at 6–7.

In response, Plaintiffs referred to evidence indicating that Alliant had classified Reeves, Cavanagh, and the opt-ins as "exempt" employees; that all plaintiffs worked in the ESC division of Alliant's Marine Systems Group; that all plaintiffs worked in support of the NUWC contracts; and, that all plaintiffs were subject to the same payroll procedures and administrative policies, including the Armbruster memorandum. Plaintiffs characterized the Armbruster memorandum as an ESC division-wide policy developed through the collaborative efforts of Lee Moraski (ESC Director), Roger Hull (ESC Director of Human Resources), Larry Armbruster (Site Manager in Keyport), Tony Misslin (Site Manager in Newport), and Alliant's legal counsel in Minneapolis to enforce an ESC policy which required all ESC exempt employees "Keyport and Newport" to work uncompensated overtime.

In light of what then appeared to be a substantial dispute over a material fact, the court denied both Alliant's motion to restrict joinder and motion *in limine*. Notwithstanding its pretrial ruling, the court noted that "there may have been variations in how [Alliant's] policy was communicated and enforced between Newport and Keyport." Trans. 5/18/98, pages 5–6. The pre-trial record was particularly unclear with respect to the creation and

---

4. The FLSA imposes a two year—and in certain circumstances, a three year—statute of limitations. *See* 29 U.S.C. § 255; *see also infra,* § II A. Opt-in plaintiff David J. Charest joined this suit on a date beyond the broader statute of limitations; therefore, the court dismissed his claim.

dissemination of the Armbruster memorandum.

During trial, the parties presented evidence which the court finds establishes that the ESC employees supporting NUWC Keyport were subject to the Armbruster memorandum, and ESC employees supporting NUWC Newport were not. More particularly, the evidence shows (1) that the Armbruster disciplinary procedure was disseminated and implemented solely by the Keyport site manager; (2) that it had never been formally adopted as a policy applicable to all ESC exempt employees; (3) that neither Newport site manager, Misslin or Griglak, had ever implemented the disciplinary practice set forth in the Armbruster memorandum; (4) that the Armbruster memorandum had never been distributed to employees in the Newport office; and (5) that neither Reeves, Cavanagh, nor any other Newport employee had ever seen the Armbruster memorandum prior to the commencement of this suit.

Because the Armbruster memorandum was not a company-wide policy affecting all ESC exempt employees, and because Reeves and Cavanagh were never subject to its provisions, the court concludes that the named plaintiffs Reeves and Cavanagh, are not "similarly situated" to the Keyport opt-in plaintiffs who were subject to the Armbruster memorandum. Because Alliant operated on a decentralized basis with respect to its employee relations, the court finds Reeves and Cavanagh to be "similarly situated" only to employees supporting the NUWC Newport contract who were directly subject to Misslin and Griglak's supervision. *See* Fed.R.Civ.P. 23, advisory committee's note (an order regarding class scope may be "altered or amended before the decision on the merits if, upon fuller development of the facts," the original determination appears imprecise).

The claims of the opt-in Plaintiffs who the court finds are not "similarly situated" to Reeves and Cavanagh, are therefore dismissed without prejudice. The court proceeds to decide the claims of Reeves, Cavanagh, and the opt-in plaintiffs "similarly situated" to them.

## II. PLAINTIFFS' FLSA CLAIM

### A. The FLSA's Statute of Limitations

■ The limitation period prescribed by 29 U.S.C. § 255 is two years. Nevertheless, if the affected employee can establish that the employer willfully breached the FLSA, then he can bring a claim up to three years after the alleged violation. *See Bankston v. Illinois,* 60 F.3d 1249, 1253–54 (7th Cir.1995); *Cox v. Brookshire Grocery Co.,* 919 F.2d 354, 356 (5th Cir. 1990). In civil actions, the term "willful" applies to violations which are "intentional, knowing or voluntary, as distinguished from accidental; it is used to characterize intentional disregard of or plain indifference to statutory requirements." *Dunlop v. Rhode Island,* 398 F.Supp. 1269, 1285 (D.R.I.1975) (citing *United States v. Illinois Cent. R. Co.,* 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938)).

■ To establish willfulness in a FLSA suit, a plaintiff must prove that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *see Lockaby v. Top Source Oil Analysis, Inc.,* 998 F.Supp. 1469, 1471 (N.D.Ga.1998).

■ Plaintiffs contend that Alliant's conduct since 1992 has evinced a reckless disregard for its obligations under the FLSA. On this issue, the court must evaluate Alliant's conduct in light of the state of the law at that time. *See Lockaby,* 998 F.Supp. at 1472 n. 3.

Prior to the Supreme Court's decision in *Auer v. Robbins,* 519 U.S. 452, 458, 117 S.Ct. 905, 910, 137 L.Ed.2d 79 (1997), courts were split as to whether "an employee's pay is 'subject to' disciplinary or other deductions whenever there exists a

theoretical possibility of such deductions, or rather only when there is something more to suggest that the employee is actually vulnerable to having his pay reduced." To the extent that Alliant's policies may have created the "theoretical possibility" of such deductions, the court does not find them to be inconsistent with the FLSA. Although Alliant admittedly imposed improper deductions against certain exempt employees during the relevant time frame, the court cannot infer from the evidence presented in the instant case that Alliant's alleged FLSA violations were "willful."

Plaintiff bears the burden of showing that defendant's conduct was willful for purposes of calculating the statute of limitations. *See Bankston,* 60 F.3d at 1253. In light of the court's findings as set forth below, Plaintiffs have failed to meet their burden. Accordingly, the court confines its consideration of Reeves and Cavanagh's allegations with respect to the two-year statute of limitations period.

### B. FLSA Exempt Status—The *Auer* Standard

Section 7(a)(1) of the FLSA, see 29 U.S.C. § 207(a)(1), requires an employer to pay its employees at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of forty in a week. The FLSA then exempts from the overtime pay requirement those employees working in "bona fide executive, administrative, or professional" positions. *See* 29 U.S.C. § 213(a)(1). In order to obtain the benefit of such an exemption, an employer must demonstrate that the employee meets both a "duties test," see 29 C.F.R. § 541.1, and a "salary test," see 29 C.F.R. § 541.118. Alliant has the burden of proving that Plaintiffs "plainly" and "unmistakenly" fall within the terms of an exemption. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *see also Cash v. Conn Appliances, Inc.,* 2 F.Supp.2d 884, 893 (E.D.Tex.1997)("employer escapes liability

only by showing by a preponderance of the evidence that the employee falls within an exception or exemption to the overtime requirement."). "Because the FLSA is a remedial act, its exemptions are to be narrowly construed." *Cooke v. General Dynamics Corp.,* 993 F.Supp. 50, 52 (D.Conn. 1997) (citing *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)). In the instant matter, the parties have stipulated that Reeves and Cavanagh performed the duties of exempt employees.

An employee will be considered to be paid "on a salary basis" if

> he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is *not subject to reduction* because of variations in the quality or quantity of the work performed.

29 C.F.R. § 541.118(a) (emphasis added). In order to qualify for exempt status the employee "must receive his full salary for any week in which he performs any work," although he need not be paid for any week in which no work is performed. *Id.* Plaintiffs were paid biweekly in excess of the minimum amount of compensation for "exempt" employees under the FLSA. Therefore, the central issue before this court is whether the Plaintiffs' salaries were "subject to" an impermissible reduction.

An employee who is subject to "disciplinary or other deductions in pay, 'as a practical matter,' " is not exempt from FLSA's overtime pay provisions. *Auer,* 117 S.Ct. at 911. *Auer*'s "as a practical matter" standard is met in either of two circumstances: (1) when the employer has an "actual practice of making such deductions," or (2) when an employer has an "employment policy that creates a 'significant likelihood' of such deductions." *Id.*

In the instant matter, Plaintiffs contend that Alliant had both an actual practice of making impermissible deductions and poli-

cies which " 'effectively communicated a significant likelihood' that ESC time reporting exempt employees would experience pay cuts for not working UCOT[5] hours." *See* Pls.' Post Trial Mem. at 26 & 30.

## C. Actual Practice

■ Plaintiffs contend that Alliant had an "actual practice" of docking exempt employees who turned in less than 40 hours on their time sheets. In support of this contention they point to the fact that there were pay reductions on an hour for hour basis for some exempt employees. In addition, they argue that because they were required to show 40 hours on their weekly time sheets, Alliant would have docked them if they wrote in fewer than 40 hours.[6] The evidence presented does not support either theory.

Alliant presented Larry Schmitt (Schmitt), the Manager of Payroll Services since 1991. Schmitt explained that time-reporting employees (like Reeves and Cavanagh) filled out the same form (time sheet) whether they were exempt or non-exempt. To simplify the process, payroll clerks were instructed to separate those forms with 40 hours from those that had a number different from 40. The next step was to discard those forms with 40, since all ESC employees were set up as salaried employees. Of the sheets with numbers other than 40, the clerk was supposed to separate exempt from non-exempt. The form had been designed to include a block to be filled out by the employee to designate whether they were exempt or non-exempt. The clerk was then supposed to verify exempt or non-exempt status as well as any noted deduction. If the employee was designated "exempt," the clerk was instructed to bring the sheet to Schmitt for his review. Schmitt further testified that he believed payroll for exempt employees was being processed in accordance with the sorting process he described, that is, no deductions were being made to the salaries of exempt employees.

At some point in 1995, however, Schmitt learned that a one hour deduction had been made to the paycheck of an ESC exempt employee. Schmitt immediately contacted Beth Campbell (Campbell), the payroll clerk who had processed the time sheet in question. Campbell told Schmitt she did not know how to determine exempt or non-exempt status and did not know that it made a difference. Schmitt then "spent some time on the phone educating her." Trans. 5/19/98, page 142.

Campbell also testified at trial and candidly admitted that she had made the error which Schmitt described. She testified that she had no formal training, but that she did have a copy of Alliant's Time Reporting Guidelines Manual which expressly provides that no deductions are to be made to the paychecks of exempt employees.[7]

**5.** The term "UCOT" is used by the Department of Defense in its procurement regulations to describe hours in excess of 40 in one week worked by exempt employees without additional compensation beyond their regular salary. *See* 48 C.F.R. § 252.237–7019(a)(1).

**6.** Despite Plaintiffs' contentions to the contrary, the record is devoid of any Alliant written or oral policy which effectively communicates the significant likelihood of such deductions. This theory of recovery is based solely upon the subjective belief such deductions would be made as expressed by Plaintiffs and their witnesses. *See McGuire v. City of Portland*, 159 F.3d 460, 463 (9th Cir.1998) ("the 'controlling factor is not whether the department head or the employees subjec-

tively believed [that] the employees could be subject to' disciplinary deductions, but rather whether there was, objectively, a significant likelihood that penalties inconsistent with salaried status would be made.") (quoting *Stanley v. City of Tracy*, 120 F.3d 179, 185 (9th Cir.1997)).

**7.** Alliant issued its Time Reporting Guidelines Manual in October 1993. At page 2–17, the Manual provides as follows:

If time is to be taken off without pay by an *exempt* employee, the time report showing less than 40 hours charged must have a letter attached from management approving the deduction. The time report and the letter must be sent together to Payroll. *Otherwise, no deduction will be made.*

Campbell stated that she did not follow the procedure described by Schmitt or the procedure set forth in the Time Reporting Guidelines Manual.

Schmitt ordered a review of all paychecks where a negative transaction was entered going back to January 1993. His review uncovered errors totaling approximately $30,000 to $35,000. The number of employees who were affected was 54. This figure is significant in that during the years in question between 700–900 employees' time sheets were processed through the Marine Services payroll clerk in Mukilteo. The court also finds that neither Reeves nor Cavanagh had any such deduction even though several of their time sheets reported less than 40 hours to payroll during this time frame.

Alliant argues that it properly availed itself of the "window of correction," see 29 C.F.R. § 541.118(a)(6), and therefore the exemption should not be considered lost. The court agrees. The court finds that Alliant had no actual practice of making prohibited deductions. Rather, Alliant had in place a written policy which expressly provided that no deduction would be made to an exempt employee's check unless there was a letter from management approving such deduction attached to the time sheet. *See* Def.'s Ex. 16 at 2–17; *supra,* at n. 7. This express policy was reiterated throughout the memoranda introduced at trial.[8] The court further finds that the deductions made on the 54 employees identified in Schmitt's survey were the result of inadvertence and mistake on the part of Alliant's payroll clerk. The court found both Schmitt and Campbell's testimony to be credible and consistent as

to how those deductions were made. Neither party disputes the fact that Alliant has fully reimbursed the affected employees, noted its error, and promised to avoid such deductions in the future. (Vol. 2, Schmitt, p. 146, Def.'s Exs. 49 & 50).

It is the judgment of this court, that Alliant properly availed itself of the "window of correction" to make whole those employees whose paychecks had been inadvertently short-changed. *See Davis v. City of Hollywood,* 120 F.3d 1178, 1180–81 (11th Cir.1997), *cert. denied,* 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998) (window of correction available to correct multiple deductions); *Arrington v. City of Macon,* 973 F.Supp. 1467, 1475 (M.D.Ga. 1997) (window of correction available to correct multiple deductions); *Simmons v. City of Fort Worth,* 805 F.Supp. 419, 425 (N.D.Tex.1992) (window of correction available where 20 percent of City's exempt employees suffered improper deductions over four year period); *Keller v. City of Columbus, Indiana,* 778 F.Supp. 1480, 1487 (S.D.Ind.1991) (window of correction available to correct multiple deductions over three year period).

### D. "Clear and Particularized" Policy

The other formulation of the salary basis test requires that there be a policy that communicates to exempt employees that there is a "significant likelihood" of pay docking, that is, "a clear and particularized policy—one which 'effectively communicates' that deductions will be made in specified circumstances." *Auer,* 117 S.Ct. at 911. The Court in *Auer* reviewed a policy which applied to both exempt and nonexempt employees. The Court held that

---

Def.'s Ex. 16 (emphasis added).

**8.** *See, e.g.,* Def.'s Ex. 18 at 1, Payroll Teleconference Minutes dated 11/10/93 ("[A]s we know here at ESC, an exempt is entitled to his pay—40 hours worth—if any hours are worked at all."); Def.'s Ex. 47 at 2–3, Memo Re: Exempt Pay Practices dated 8/1/95:

*Exempt Pay Practices:*

A. *Pay Deductions*

*Current Practice:* Exempt employees are not to have pay deductions from their usual full day pay level for any reason, other than for safety infractions.... Supervisors are not to require exempt employees to take vacation for partial days of personal absence. Directed leaves or layoff for lack of work may not be for less than a full workweek.

*Status:* This is current practice.

such a broadly worded policy did not defeat the FLSA exemption. The Supreme Court opined that this approach "avoids the imposition of massive and unanticipated overtime liability" where "a vague or broadly worded policy is nominally applicable to a whole range of personnel but is not 'significantly likely' to be invoked against salaried employees." *Id.* at 911.

With respect to the "policy" issue in the instant matter, the parties submitted hundreds of documents including internal memoranda, company proposals, and time sheets. From this flurry of paperwork, Plaintiffs identify the following documents as evidence of Alliant's alleged FLSA violations: (1) Human Resource Practice No. 9; (2) Human Resource Practice No. 2.10L1; (3) Human Resource Practice No. 3.0L1; (4) Human Resource Practice No. 8.30; and, (5) Moraski's Reduced Workweek/Reduced Salary Option plan.

### (1) Human Resource Practice No. 9

█ In July 1990, just three months before Honeywell spun off its marine business to Alliant, the company implemented Practice No. 9, whereby ESC exempt and nonexempt employees could be sent home for as little as half a day when there was no work available. *See* Def.'s Ex. 23, pages 7–8. The half day minimum remained in effect until June 1993. Between July 1, 1993 and October 1, 1993, the minimum period of directed leave, for exempt and nonexempt employees, was increased to one full day. *See* Def.'s Ex. 23, pages 1–6. If the affected employee did not have sufficient accumulated compensation time, vacation time or personal leave time to cover the absence, the leave would be without pay.

There is no evidence that any ESC exempt employee actually suffered a partial week reduction in pay due to Alliant's directed leave policy. In the absence of any actual deductions, the court must determine whether the policies in question were "clear and particularized." Because Practice No. 9 nominally covered all employees, it did not "effectively communicate" a "significant likelihood" of partial week suspensions without pay "in specified circumstances" for exempt employees.[9] *See Auer*, 117 S.Ct. at 911. As in *Auer*, this general policy does not defeat salary basis. *See id.; accord West v. Anne Arundel County, Maryland*, 137 F.3d 752, 763 (4th Cir.1998); *Ahern v. County of Nassau*, 118 F.3d 118, 121–22 (2d Cir.1997); *Balgowan v. New Jersey*, 115 F.3d 214, 219 (3d Cir. 1997); *Stanley*, 120 F.3d 179, 184 (9th Cir.1997); *Carpenter v. City & County of Denver*, 115 F.3d 765, 766–67 (10th Cir. 1997); *DiGiore v. Ryan*, 987 F.Supp. 1045, 1051 (N.D.Ill.1997).

### (2) Human Resource Practice No. 2.10L1

█ On October 1, 1993, Practice No. 9 was replaced by Practice No. 2.10L1 which made the minimum directed leave, for *exempt* employees, one full week. *See* Def.'s Ex. 24. Practice No. 2.10L1 stated in pertinent part: "[W]hen ... work is not available for periods encompassing a full workweek or more, regular status exempt employees may be required to use accrued compensatory time or vacation, or be placed on unpaid LOA [leave of absence] until direct charge work is available. In like situations of any length," nonexempt employees would be required to do the same. *Id.*

An employee is exempt from FLSA's overtime requirements only if his pay "is not subject to reduction because of variations in the quality or quantity of the work performed"; an exempt employee "must receive his full salary for any week in

---

9. Again, Plaintiffs unsuccessfully attempt to narrow the applicability of an Alliant policy based upon their subjective understanding of it. *See* Pls.' Post Trial Mem. at 13 (*"Consistent with their understanding* that like all other ESC exempt employees, they were subject to the 'no work no pay' Practice No. 9 policy, Reeves and Cavanagh, like everyone else, worked the extra UCOT hour each and every week to be used *in the event* of the implementation of Practice No. 9 against them.") (emphasis added); *see also supra*, at n. 6.

which he performs any work without regard to the number of days or hours worked." 29 C.F.R. § 541.118(a). This Section also provides that an exempt employee need not be paid in any week in which the employee performs no work. *See id.;* Secretary of Labor's Brief As Amicus Curiae at 18 n.5, *Auer* (No.95–897) ("the Secretary has adopted a general policy, reflected in 29 C.F.R. § 541.118(a), not to question the salaried status of an employee who receives no pay in a week in which the employee performs no work.").

Practice No. 2.10L1 which does apply to exempt employees, comports with the FLSA and its implementing regulations in that it sets the minimum period for directed leave at a full workweek.

(3) Human Resource Practice 3.0L1

In its proposal to NUWC Newport for the follow-on contract, Alliant told the government that "all exempt employees of Newport Operations will be required to work an average of five hours per week of uncompensated overtime (UCOT)." Def.'s Ex. 37, page 5–11. Alliant expected to enforce its "corporate policy on Competitive Time" by way of Practice 3.0L1. *See id.,* App. G. Although Practice No. 3.0L1 was attached as an addendum to Alliant's "technical proposal" to the government, Alliant never in fact adopted Practice No. 3.0L1 as an official company policy. Trans. 5/19/98, page 5.

Plaintiffs contend that Practice No. 3.0L1 is an unlawful "policy" because it required "exempt employees [to] work 5 hours of UCOT or take a salary cut ..." Pls.' Post Trial Mem. at 17. Notwithstanding Plaintiffs' inaccurate characterization of this document, the court need not address the propriety of the provisions in Practice No. 3.0L1 because Practice No. 3.0L1 was never adopted by Alliant and therefore cannot be considered a company "policy."

(4) Human Resource Practice 8.30

██ Plaintiffs also cite Practice No. 8.30 as evidence of an Alliant policy which communicated a significant likelihood that impermissible deductions would· be made. According to Plaintiffs, "[t]his practice spelled out a series of disciplinary steps ranging from counseling to suspension to termination." Pls.' Post Trial Mem. at 16. Plaintiffs' assertions are only half right.

Practice No. 8.30 is a general disciplinary policy, applicable to "all salaried employees"—exempt and nonexempt alike—which identifies the various forms of discipline that Alliant managers may use as they see fit. *See* Def.'s Ex. 38; Trans. 5/19/98, page 6. The types of discipline include counseling, warnings, suspensions and termination. The policy does not refer to UCOT requirements, nor does it mandate any particular discipline that will be used if an exempt employee refuses to work an average of 45 hours per week. *See* Def.'s Ex. 38; Trans. 5/19/98, pages 83–84.

This is precisely the type of "vague or broadly worded policy" that the Supreme Court held does not make an employee's pay subject to deduction as a practical matter. *Auer,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79. It simply describes a variety of disciplinary procedures which a supervisor may invoke at his or her discretion. In this regard, it is similar to the policy reviewed by the Supreme Court in *Auer.* In like vein, it does not transform Reeves and Cavanagh into nonexempt employees.

(5) Moraski's Reduced Workweek/Reduced Salary Option

██ In June 1994, Alliant was awarded a three year contract as a follow-on to its two-year sole-source contract with NUWC Newport. The follow-on contract was a "cost plus" contract with a fixed fee based upon the number of hours of contract work performed. In order to lower its labor costs on the follow-on contract and to win this contract over its competitors, Alliant

proposed hourly rates based upon the assumption that its exempt employees would work, on average, 45 hours per week.[10] *See* Def.'s Ex. 37.

On July 28, 1994, Griglak announced the 45 hour average workweek requirement to his Newport employees. *See* Def.'s Ex. 39. In order to maintain their salaries, exempt employees assigned to the contract would be required to work on average five mandatory uncompensated overtime (UCOT) hours per week. If they wished to be relieved of the 45 hour requirement, they could choose to work an average of 42.5 hours per week and accept a 5.5 percent reduction in their salary, or work an average of 40 hours per week and accept an 11.1 percent reduction. *Id.* Neither Reeves nor Cavanagh nor any other Newport employee chose either option.

About four months later, Moraski issued another memorandum which eliminated these two options. *See* Def.'s Ex. 41. Nevertheless, Griglak and Moraski were still willing to accommodate any employee who had a need for a reduced work schedule.

With respect to Moraski's Reduced Workweek/Reduced Salary Option plan, Plaintiffs argue that employees who opted not to work the 5 hours of UCOT would ultimately be subject to a unilateral pay cut. *See* Pls.' Post Trial Mem. at 17. Some of Plaintiffs' witnesses testified that they were threatened with "pay reduction" or with having their pay "docked" if they failed to work on average 45 hours per week, but the evidence established that while there was a communication about the option of working a reduced workweek (less than 45 hours) in exchange for a reduction in pay, Alliant had not expressed an intent to make deductions from an ex-

empt employee's salary on an hour-for-hour basis if the employee failed to work 45 hours in a week. For example, Reeves and Cavanagh worked less than 45 hours in several weeks, yet neither received a deduction in pay. On this issue, Cavanagh testified that he could not recall whether Griglak used the words "dock your pay," "reduce your pay" or "cut your pay," but he could recall that Griglak told him he had an option to take a reduction in salary and work fewer hours.

Under the Department of Labor regulations, an employee will be considered to be paid "on a salary basis" if he receives a salary that is "not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a). "[I]f the employee is ready, willing, and able to work, deductions may not be made for time when work is not available." 29 C.F.R. § 541.118(a)(1). That is, a reduction in work time unilaterally imposed by the employer may not be the basis for a reduction in salary. *See, e.g., Dingwall v. Friedman Fisher Assoc., P.C.,* 3 F.Supp.2d 215, 220 (N.D.N.Y.1998). (Employer reduced the workweek of its staff, including plaintiff, from five days to four and simultaneously reduced their salaries by one-fifth.). The Defendant in *Dingwall* argued that its unilateral salary adjustment did not constitute a deduction in salary, but was "merely a change in the 'regular' salaries to a new 'predetermined' salary amount." *Id.* The court rejected this interpretation of the FLSA's salary basis test, stating that

> Defendant was not merely altering plaintiff's fixed salary (which it undoubtedly had the right to do), it was altering it on the basis of a reduction in the amount of days worked in response to

---

10. Alliant was aware that government contractors in Rhode Island routinely proposed rates based upon the assumption that exempt employees would work in excess of 40 hours per week. Trans. 5/18/98, pages 97–98. This produces a lower cost per hour than rates based upon the assumption that exempt employees would work, on average, 40 hours per

week. *Id.* at 99. Alliant was specifically aware that its primary competitor for the follow-on contract-Westinghouse—had in the past proposed rates based upon a 47 hour workweek for its exempt employees. *Id.* at 98. Alliant was successful in its bid, but less successful in selling its employees on a 45 hour workweek.

an insufficient amount of work available. The fact that this was done as an enforced policy of the employer rather than in response to decisions of the employee does not alter the basic fact: plaintiff's pay was reduced as a result of reduction in days worked. ·

*Id.* at 220.

Under Moraski's policy, Alliant's ESC employees could voluntarily choose the number of hours they wanted to work. That is, any employee "ready, willing, and able to work" the average 45 hours per week, could elect to do so. Unlike the *Dingwall* scenario, the number of hours to be worked was not based on what work was available, but rather on the individual employee's election of a reduced workweek. Accordingly, the court finds Alliant's Reduced Workweek/Reduced Salary Option policy to be consistent with the requirements for exempt status under the FLSA.

### III. RETALIATION

■ Reeves contends that Alliant terminated his employment because he filed a Fair Labor Standards Act suit against the company. The FLSA's anti-retaliation provision prohibits an employer from penalizing an employee who seeks to enforce rights guaranteed by Federal law. *See* 29 U.S.C. § 215(a)(3). The elements of a retaliation claim require, "at a minimum, a showing that (1) the plaintiff engaged in statutorily protected activity, and (2) his employer thereafter subjected him to an adverse employment action (3) as a reprisal for having engaged in the protected activity." *Blackie v. State of Maine,* 75 F.3d 716, 722 (1st Cir.1996).

■ Here, Reeves easily demonstrates the first two elements of his prima facie case; it is uncontested that Reeves engaged in a protected activity by filing suit under the FLSA and that Alliant subsequently imposed an adverse employment action by terminating his position in April 1996. The third element, therefore, is the determinative factor on this issue. Under it, a plaintiff must proffer evidence which enables a trier of fact to reasonably infer that "a causal connection existed *between the protected conduct and the adverse action." Id.* at 723 (quoting *Mesnick v. General Elec. Co.,* 950 F.2d 816, 827 (1st Cir. 1991)).

Reeves's problems with Alliant management began, by his own admission, in early 1994. When Reeves refused to return to Newport to complete his assignment in Newport, Moraski directed Reeves to remain in Minnesota and support the NUWC Newport contract from there. *See Reeves I,* Order dated January 29, 1999. Although Reeves ultimately complied with this directive, his relationship with the company and his supervisors became progressively more contentious as time proceeded. *See* Def.'s Ex. 99.

During the period from January 1, 1994 through January 1, 1995, Reeves's "leadership value as a role model ha[d] diminished due to his continuing issues with time sheet procedures, work direction clarification and heavy use of burden charges during his workweek that [took] time away from his task direction." Def.'s Ex. 92. For instance, Reeves asked his supervisors to put most of his assignments, even routine requests, in writing. *See, e.g,* Def.'s Exs. 69 & 70. Reeves also became a prolific and garrulous memorandum writer on any subject which concerned him. Reeves included on his time sheets the many hours he alleges he spent filling out his time sheets (e.g., 1–4 hours/week), writing memos to Alliant executives on the same subject (e.g., 6 hours/week), and corresponding with William Robinson, one of Alliant's attorneys in this suit. *See* Def.'s Ex. 10.

In April 1995, Griglak tried to administer a performance appraisal to Reeves. Although Reeves had requested the appraisal, Griglak had a difficult time getting Reeves to commit to a date for their meeting. Griglak scheduled a meeting, but

Reeves did not attend.[11] To ensure Reeves's presence at their next scheduled meeting, Griglak ordered Reeves to attend. Still Reeves did not show.

Unable to communicate Reeve's performance appraisal to him, Griglak subsequently mailed it. In the appraisal, Griglak expressed concern regarding Reeves's deteriorating performance and criticized Reeves's direct labor yield.[12] According to Griglak, Reeves's technical work was good, but he was doing less of it than expected.

Following the aborted attempt at a performance appraisal meeting, Reeves wrote a five page memorandum to Alliant's CEO titled "Seemingly Nefarious Performance Appraisal Behavior by Alliant Techsystems." *See* Def.'s Ex. 93. Reeves's time sheet for that particular week indicates that he spent 19 hours writing this particular memorandum. *See* Def.'s Ex. 10 (period ending 4/9/95).

In November 1995, Moraski sent Reeves a memorandum regarding his ineffective work performance and "increasingly confrontational" demeanor. *See* Def.'s Ex. 99. Again, Moraski reminded Reeves that he was spending too much time on personal matters and not enough time on direct chargeable tasks. According to Moraski, Reeves "excessively question[ed] routine work directions" so as to "avoid compliance with directives" easily followed by other employees. *Id.*

For example, Reeves refused to use the current time reporting forms utilized by other employees in his work assignment area. Even though he had access to clean time sheets, Reeves recycled the same time form each week—scratching out the previous week's data and sloppily writing over it with the current week's information. Moraski also noted the fact that

Reeves spent an "unreasonable" and "overly excessive" amount of time pursuing personal matters on company time. *See id.* For instance, Reeves distributed a personal memorandum related to this lawsuit to Alliant employees on company letterhead and through company mails. Moraski warned Reeves, "you appear to believe [that] performance of your personal interests take precedence over company work; that is not correct." *Id.*

In January 1996, Griglak and Moraski began to plan for Alliant's upcoming fiscal year. At that time, the work that Alliant was doing for NUWC Newport was primarily on the Mark 50 torpedo (Reeves's area of expertise), but the budgets for that program were being slashed. A new program involving the lightweight hybrid torpedo (LHT), took its place and Moraski wanted to position ESC to be available for that business. Moraski wanted to bring Bob Matthews into ESC since he had the necessary experience to support the LHT program. However, with the addition of Matthews and his salary, Moraski did not feel that he could afford to retain Reeves, particularly because he was a very highly paid employee who had not been productive since early 1994, and he did not have the background and experience to lead the LHT program. For these reasons, Alliant decided to lay off Reeves.

 In the instant matter, Reeves has presented no evidence whatsoever to establish Alliant's retaliatory animus. The court finds that Reeves's termination had nothing to do with the filing of this legal action—except to the extent that Reeves completely disregarded his job tasks and instead, used company time to further his own litigation. The court finds that Alliant

---

11. At trial Reeves testified that he was out of the office on the date Griglak had scheduled the meeting caring for a terminally ill family member. Griglak testified that Reeves never mentioned this circumstance. If he had, Griglak would not have scheduled Reeves's performance evaluation for that same day. Finding Griglak to be a more credible witness than Reeves, the court adopts Griglak's version of the facts. *See* Reeves I, Order dated January 29, 1999.

12. Direct labor yield is the percentage of direct charge work relative to the total time charged by the employee.

had more than sufficient cause to terminate Reeves long before it ever chose to do so. The evidence presented at trial revealed multiple examples of Reeves's insubordinate and surreptitious conduct dating back to early 1994.

Although Reeves may have been a qualified employee and expert in his field, his confrontational and evasive behavior created definite performance issues. From 1994 until his final termination in 1996, Reeves's direct labor yield dropped substantially. He obsessively questioned company policy. He improperly used Alliant property for his own devises. And he flagrantly ignored the direct orders of his superiors. Accordingly, the court finds in favor of Alliant on this count.

## IV. CONCLUSION

For the reasons detailed above, this court denies Plaintiffs' Rule 52 motion and grants judgment in favor of Alliant on all counts.

SO ORDERED: