Debbie TREZVANT, Timothy Cahill, Deborah Arch & Mary–Catherine Piche, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

FIDELITY EMPLOYER SERVICES CORPORATION, Fidelity Employer Services Company, LLC & FMR Corporation, Defendants.

Civil Action No. 05–10673–WGY.

United States District Court, D. Massachusetts.

June 1, 2006.

Michael D. Palmer, Charles Joseph, Joseph & Herzfeld PC, New York, NY, Thomas E. Kenney, Pierce & Mandell, PC, Boston, MA, Ira Spiro, Rebecca J. Sobie, Spiro, Moss, Barness, Harrison & Barge LLP, Los Angeles, CA, for Plaintiffs.

Barry J. Miller, Krista G. Pratt, Richard L. Alfred, Seyfarth Shaw, LLP, Boston, MA, Brett C. Bartlett, Seyfarth Shaw LLP, Atlanta, GA, for Defendants.

## MEMORANDUM

YOUNG, District Judge.

## I. INTRODUCTION

This action was brought on behalf of current and former employees ("the Em-

ployees") of Fidelity Employer Services Corporation ("Fidelity Corp.") who worked in an analyst position—Technical Analyst, Business Analyst, Configuration Analyst, Project Analyst, and Reporting Analyst— as salaried employees and were classified as exempt from overtime pay requirements. Am. Compl. [Doc. No. 12] ¶¶ 1, 2. The Employees allege violations of the Fair Labor Standards Act ("Fair Labor Act"), 29 U.S.C. § 201 et seq., and New Hampshire wage and hour laws as a result of Fidelity Corp.'s alleged unlawful classification of the Employees as exempt, when actually they are non-exempt and entitled to overtime pay. Id. ¶¶ 1, 13–19, 24–29.

On October 26, 2005, the Court granted the Employees' motion conditionally to certify a collective action under the Fair Labor Act as to Reporting Analysts, Project Analysts, and Business Analysts. Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss [Doc. No. 32] ("Pl. Dismiss Opp.") at 4, n. 1. On February 14, 2006, the Court granted Fidelity Corp.'s and FMR Corporation's (collectively "Fidelity") motion to dismiss the Employees' claim of violation of New Hampshire wage law. Motion Hr'g, Feb. 14, 2006, Tr. at 8:11–2. On May 3, 2006, only a few more individuals having opted into the conditionally certified class, the Court decertified the class upon the joint motion of all parties. Order on the Parties' Stipulation and Joint Mot. [Doc. No. 54]. This memorandum explains these rulings.

## II. Conditional Certification Of A Collective Action Under the Fair Labor Act

The Fair Labor Act requires an employer subject to its provisions to pay its employees at a rate of time-and-a-half for hours worked in excess of forty hours unless those employees are exempt. 29 U.S.C. § 207(a)(1), § 213(a)(1). Employees that serve in a bona fide executive, administrative, or professional capacity are exempt from this requirement. Id. § 213(a)(1). The Fair Labor Act also provides that:

> An action ... may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated.* No employee shall be a party plaintiff to any such action unless he gives consent in writing to become such a party and such consent is filed in the court in which such action is brought.[1]

29 U.S.C. § 216(b) ("Section 216") (emphasis added).

### A. The Proper Standard of Review

This District has used at least two methods for determining whether potential plaintiffs are similarly situated for certification of the Section 216 "opt-in" representative action. The first method is a two-tier approach where the court makes an initial determination of whether the potential class should receive notice of the pending action and then later, after discovery is complete, the court makes a final "similarly situated" determination. *Kane v. Gage Merchandising Servs., Inc.,* 138 F.Supp.2d 212, 214 (D.Mass.2001) (Gorton, J.). The second approach is to apply the standards of Rule 23—numerosity, commonality, typicality, and adequacy of representation—to determine certification of a collective action. *Dionne v. The Ground Round Inc.,* No. 93–11083, 1994 U.S. Dist. LEXIS

---

1. As the plaintiffs accurately point out, *see* Pl.'s Mem. in Support of Mot. for Conditional Collective Certification and for Court Facilitation of Notice Pursuant to 29 U.S.C. § 216(b) [Doc. No. 20] ("Pl.Cert.Mem.") at 7, the statute of limitations for each collective class member continues to run until he or she has filed a consent to participate in the action. *See* 29 U.S.C. § 256.

21641, at *6–7 (D.Mass. July 6, 1994) (Stearns, J.) (applying Rule 23 to an age discrimination collective action to the extent it is consistent with Section 216(b)).

Although both methods have been applied in this District, the majority of courts addressing this issue in the First Circuit have adopted the two-tier approach. *See Kane*, 138 F.Supp.2d at 214; *Reeves v. Alliant Techsystems, Inc.*, 77 F.Supp.2d 242, 246 (D.R.I.1999); *Cintron v. Hershey Puerto Rico, Inc.*, 363 F.Supp.2d 10, 15 (D.P.R.2005). In addition, a majority of courts outside the First Circuit adopt the two-tier approach. *See Leuthold v. Destination America*, 224 F.R.D. 462, 466 (N.D.Cal.2004) (noting, in applying the two-tier approach, that a majority of courts adopt that approach); *Threatt v. CRF First Choice*, No. 05–CV–117, 2005 U.S. Dist. LEXIS 16903, at *6–7 (N.D.Ind. Aug. 12, 2005) (same). The First Circuit has not yet addressed this issue. This Court follows the majority of courts and adopts the two-tier approach.

■ Only a preliminary finding of "similarly situated" plaintiffs is necessary to authorize notice to potential class members. *Cintron*, 363 F.Supp.2d at 16. Usually, the initial stage determination is based "only on the pleadings and any affidavits which have been submitted." *Kane*, 138 F.Supp.2d at 214. As a result of the minimal evidence available, this determination is made using a fairly lenient stan-

dard, which typically results in conditional certification of the representative class. *Id.* At this stage, courts do not need "to make any findings of fact with respect to contradictory evidence presented by the parties or make any credibility determinations with respect to the evidence presented." *Kalish v. High Tech Inst.*, No. 04–1440, 2005 WL 1073645, at *2, 2005 U.S. Dist. LEXIS 8238, at *7 (D.Minn. Apr. 22, 2005) (internal quotation marks omitted).

■ Courts have held that plaintiffs can meet this burden by making a modest factual showing or asserting *substantial* allegations [2] that "the putative class members were together the victims of a single decision, policy, or plan that violated the law." *Thiessen v. Gen. Elec. Capital*, 267 F.3d 1095, 1102 (10th Cir.2001); *see Cintron*, 363 F.Supp.2d, at 16 (following what it describes as the decision of most courts by requiring "some factual support" for class allegations). Though the Employees argue that making an unsupported allegation of a common plan is sufficient for conditional certification,[3] Pl. Cert. Mem. at 11, that position has been roundly rejected. *See, e.g., Kane*, 138 F.Supp.2d at 215 (allowing notice where the record suggested that Defendants had a policy of treating plaintiffs as exempt from Fair Labor Act overtime requirements). "[A]s a matter of sound case management," a court should make a preliminary inquiry as to whether a manageable class exists and require

---

**2.** "Substantial allegations" have been defined as detailed allegations supported by affidavits that successfully engage defendant's allegations to the contrary. *Grayson v. K Mart*, 79 F.3d 1086, 1097 (11th Cir.1996); *Aguayo v. Oldenkamp Trucking*, No. 04–6279, 2005 WL 2436477, at *3, 2005 U.S. Dist. LEXIS 22190, at *9–10 (E.D.Cal. Oct. 3, 2005).

**3.** The Employees cite *Reeves* for this proposition. In *Reeves*, the court noted that Magistrate Judge Lovegreen allowed notice based on plaintiffs' allegation that class members

were subject to a series of policies and practices enforced by management to treat class members as non-exempt employees. 77 F.Supp.2d at 247. The *Reeves* court, however, identified a specific memorandum which described procedures for enforcing a 45–hour work week; it is unclear whether this evidence was produced at the notice stage in support of conditional certification. *Id.* The *Reeves* court did not take a position on what standard should be applied at the notice stage, focusing its opinion on the second, decertification phase. *Id.*

plaintiffs to make a preliminary factual showing that there actually exists a similarly situated group of potential plaintiffs. *Cintron,* 363 F.Supp.2d at 18.

The factual showing necessary to satisfy this standard varies. Some courts only appear to require evidence of a common policy applied to the group of plaintiffs. *See Frank et al. v. Gold'n Plump Poultry,* No. 04–1018, 2005 WL 2240336, at *3, 2005 U.S. Dist. LEXIS 20441, at *9–10 (D.Minn. Sept. 14, 2005) (holding that plaintiffs' affidavits established a colorable basis for concluding that the defendant had a common policy for not paying all its workers for time spent engaged in equipment maintenance). Other courts focus more on factual, as opposed to legal, similarities amongst the class. *See Villatoro v. Kim Son Restaurant,* 286 F.Supp.2d 807, 810–11 (S.D.Tex.2003) (requiring evidence only of similar job requirements and pay provisions); *Baldozier v. Am. Family Mutual Ins.,* 375 F.Supp.2d 1089, 1092–93 (D.Colo. 2005) (holding that allegations of a common policy coupled with a showing of similarly situated plaintiffs are sufficient to grant conditional certification).

Courts have also required some combined showing of similar factual circumstances and legal claims. *See Hunter v. Sprint Corp.,* 346 F.Supp.2d 113, 119 (D.D.C.2004) ("[A] substantial identity both of factual circumstances and legal claims is required before a collective action may proceed."). Different standards for this "combined showing" have been adopted by courts. Some have evaluated a group of plaintiffs based on a three-part test: "(1) whether [plaintiffs] all worked in the same corporate department, division and location; (2) whether they all advanced similar claims; and (3) whether they sought substantially the same form of relief." *Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 51–52 (3d Cir.1989), *overruled on other grounds Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Hunter,* 346 F.Supp.2d at 119. The Eleventh Circuit requires a more substantial showing—namely, that there are other employees with similar job requirements and pay provisions, and that these employees desire to opt in, *Dybach v. Florida Dep't of Corrections,* 942 F.2d 1562, 1567–68 (11th Cir. 1991), the latter indicative of a common legal claim. Other courts have considered factors such as whether potential plaintiffs have been identified, whether affidavits of potential plaintiffs have been submitted, and whether evidence of a widespread discriminatory plan had been submitted. *England v. New Century Fin. Corp.,* 370 F.Supp.2d 504, 508 (M.D.La.2005); *Olivo v. GMAC Mortgage Corp.,* 374 F.Supp.2d 545, 548 (E.D.Mich.2004); *Pritchard v. Dent Wizard Int'l Corp.,* 210 F.R.D. 591, 596 (S.D.Ohio 2002).

■ After extensive review of the standards applied in other courts, this Court holds that the plaintiffs are required to put forth some evidence that the legal claims and factual characteristics of the class in this case are similar. The court in *Kane* seemed implicitly to make a determination of conditional certification based on both considerations. *See Kane,* 138 F.Supp.2d at 215 (granting conditional certification to a "discrete class" of Crew Coordinators where the record suggested that the defendants had a policy of treating at least some of a class of Crew Coordinators as exempt from FLSA overtime requirements).

Fidelity urges the Court specifically to adopt what it describes as "the general rule" requiring the plaintiffs "submit either one or more affidavits from other employees [besides the named plaintiffs] indicating the similarly situated nature of their job duties" or "at a minimum ... a list of employees who [plaintiffs] contend

would fit within the class." Motion Hr'g, Oct. 26, 2006, Tr. at 10:18–24. The Court declines to adopt such a hard-and-fast rule as to how plaintiffs seeking conditional certification must meet this lenient "similarly situated" standard at this initial stage. While such evidence has been considered by courts, *see Kane*, 138 F.Supp.2d at 215, this Court can find no court that *requires* a listing of potential plaintiffs as a general rule. Similarly, affidavits of potential plaintiffs have been considered by some courts; however, the submission of additional affidavits beyond those of the named plaintiffs is not necessary to make a "similarly situated" showing, and this Court does not rule that such a submission is required.[4] The Court requires a "modest factual showing" of similar factual and legal characteristics, so that the court is satisfied "that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in this case." *Mike v. Safeco Ins. Co.*, 274 F.Supp.2d 216, 220 (D.Conn.2003).

Once discovery is complete, the party opposing the conditional certification may file a motion for decertification. *Kane*, 138 F.Supp.2d at 214. At that point the Court can decide whether to decertify the class or to let the claimants proceed to trial as a collective action. *Cintron*, 363 F.Supp.2d at 16. At that stage, courts consider factors such as:

1) the disparate factual and employment settings—e.g. whether plaintiffs were employed in the same corporate department, division, and location; 2) the various defenses available to defendant which appear to be individual to each

plaintiff; and 3) fairness and procedural considerations.

*Id.* (quoting *Reeves*, 77 F.Supp.2d at 247.); *Thiessen*, 267 F.3d at 1102–03.[5]

## B. Evidence of Similarly Situated Plaintiffs

The Employees claimed that, although their job titles used the word "Analyst," they performed data entry and clerical work that "rarely, if ever, involved the exercise of discretion or independent judgment." Pl. Cert. Mem. at 4. More specifically, the Employees asserted that "[t]he work of the ... Employees consisted of receiving information from other employees and sources, entering the information into Defendants' computer network, looking at computer screens to see if the data appeared where it was supposed to appear and reporting information to supervisors." *Id.* at 5.

The Employees filed their motion to certify a collective action consisting of "[a]ll current and former employees of [Fidelity] who were or are employed as a 'Business Analyst,' 'Technical Analyst,' 'Configuration Analyst,' 'Project Analyst' and/or 'Reporting Analyst' any time on or after April 5, 2002." Pl. Cert. Mem. at 1 & Exh. A, *Notice of Pendency of FLSA Lawsuit* ("Proposed Notice") at 1.

### 1. The Employees' Allegations

The Employees alleged that:

[T]hey are and have been similarly situated, have had substantially similar job requirements and pay provisions, and have been subject to Defendants' decision, policy, plan and common policies, programs ... and rules of willfully fail-

---

4. Under this reasoning, had the Employees named only one plaintiff in this action (instead of four) and then submitted affidavits from the other three employees, as unnamed potential class members, this condition would have been satisfied.

5. Here, of course, that point was never reached as all parties have agreed to decertify the class. *See supra* p. 42.

ing and refusing to pay them at the legally required time-and-a-half rates for [overtime] and willfully failing to keep records required by the FLSA, and willfully classifying them as exempt from overtime pay even though they were non-exempt. . . .

Am. Compl. ¶ 2.

### 2. The Employees' Affidavits

In support of certification, the Employees submitted affidavits from four former employees, the named plaintiffs in this action.

Deborah Arch ("Arch") stated that she was employed as a Business Analyst by Fidelity from January 2001 through December 2002 at the Merrimack, New Hampshire office. *See* Affidavit of Deborah Cheryl Arch ("Arch Aff.") ¶ 1. She stated that her primary duties were to access and enter information on Fidelity's computerized system and observe whether new information inputted by Fidelity customers was correct within the Fidelity computerized system. *Id.* ¶¶ 3, 4. The latter was governed by specific written guidelines, according to Arch, and if data was not correctly inputted she was required to report that fact to her supervisors. *Id.* ¶ 4.

Timothy Cahill ("Cahill") stated that, between July 1999 through 2002, he has held the positions of Business Analyst, Technical Analyst, Configuration Analyst, and Reporting Analyst at Fidelity. *See* Affidavit of Timothy Cahill ("Cahill Aff.") ¶¶ 1, 3. Though he indicated that he worked at the Merrimack, New Hampshire office when employed as a Business Analyst (July 2000 through 2002), he did not indicate where he was located during his tenure in the other positions. *Id.* He described work similar to Arch's, as a Business Analyst, but added that part of his job, "and the job of other analysts at Fidelity," was to convert Fidelity's system from Benesoft to an Oracle software system, which involved locating and transferring data as well as inputting hypothetical data into the new system to see if it showed up properly. *Id.* ¶¶ 3, 4. With regard to his general duties, Cahill stated that he received the information to input by reading the customers' existing benefit plan documents and speaking with Fidelity client service managers (liaisons to the client) for a particular client. *Id.* ¶ 5.

As a reporting analyst, Cahill indicated that he was responsible for writing "projects" or "modifications" using a business text format already set up by Fidelity. *Id.* ¶ 8. He stated: "A Customer Service Manager or a member of their team had direct contact with the clients and would convey any . . . needs to me, and I would simply input the information per the clients' request into templates. . . ." *Id.* He also stated that he was responsible for sending the projects and modification via e-mail to the departments involved, asking them how much time it would take for them to complete their portion and the cost of their involvement, then e-mailing this information to the other employees at Fidelity. *Id.* ¶ 8.

Mary–Catherine Piche ("Piche") stated that she was employed as a "Project Analyst" by Fidelity from October 2000 to January 2002 in the Merrimack, New Hampshire office. *See* Affidavit of Mary Catherine Piche ("Piche Aff.") ¶ 1. The description of her responsibilities was remarkably similar—almost verbatim—to Cahill's description of his *reporting* analyst responsibilities, except she added that after typing up the project or modification, she would try to select, usually with her Project Manager, what Fidelity departments needed to be included. *Id.* ¶ 4.

Debbie Trezvant ("Trezvant") stated that she was employed by Fidelity as a Business Analyst from October 2001 to

October 2003 in the Merrimack, New Hampshire office. *See* Affidavit of Debbie L. Trezvant ("Trezvant Aff.") ¶ 1. Her responsibilities, as described by her, were similar to those described by Cahill. *See id.* ¶¶ 3–7.

All of the four named plaintiffs indicated the varying degrees of overtime they worked and their salaries, which ranged from $43,000–$53,000.[6] *See* Arch Aff. ¶ 6; Cahill Aff. ¶¶ 11, 12; Trezvant Aff. ¶¶ 10, 11; Piche Aff. ¶¶ 5, 6. The named plaintiffs all stated that they were not paid overtime and were paid a flat wage. *See* Arch Aff. ¶ 7; Cahill Aff. ¶ 12; Trezvant Aff. ¶ 11; Piche Aff. ¶ 6. Cahill and Trezvant both identified an instance where a supervisor told them that they were "not paid to think." Cahill Aff. ¶ 9; Trezvant Aff. ¶ 8. Cahill added that this was "a well-known frequently repeated statement by supervisors at [Fidelity]." Cahill Aff. ¶ 9.

None of the affidavits discussed the specific job requirements for a "Technical" or "Configuration Analyst." Cahill stated that he served in all those positions and that the primary duties of those positions were essentially the same as the duties of the Business Analyst he described. *Id.* at 3.

Trezvant, Arch and Cahill also submitted supplemental affidavits discussing the similarities they observed in the job duties of other analysts and the dissatisfaction they observed among the analysts. *See* Reply Affidavit of Deborah Arch ("Arch Aff. II") ¶¶ 2–3, 5; Reply Affidavit of Debbie Trezvant ("Trezvant Aff. II") ¶¶ 9–10, 12; Reply Affidavit of Timothy Cahill ("Cahill Aff. II") ¶¶ 16–17, 19. Both Cahill and Arch observed that the analysts they worked with were very dissatisfied with the long hours they were required to work and that the analysts were told by Fidelity that they were not entitled to overtime pay but would get "comp time" (compensatory time off) to make up for the long hours; both stated that there was very little comp time. Arch Aff. II ¶ 5; Cahill Aff. II. ¶ 19. Based on the dissatisfaction observed, both Cahill and Arch believed that "many, many analysts will be interested in participating in this lawsuit and making claims in it." Arch Aff. II ¶ 5; Cahill Aff. II. ¶ 19. Trezvant specifically referred only to the business analysts with whom she worked in making the same observations as Arch regarding dissatisfaction, promises about comp time, and interest in the lawsuit. Trezvant Aff. II ¶ 12.

Trezvant, Cahill and Arch all represented that the primary duties and tasks of an analyst were essentially the same regardless of the particular division where an analyst worked—health and welfare, human resources, defined benefit plans, and defined contribution plans. Arch Aff. II ¶ 3; Trezvant Aff. II ¶ 10; Cahill Aff. II ¶ 17.

### C. The Employees Did Not Show That The Analysts Have Similar Job Requirements And Pay Provisions

The Employees provided no factual showing of the job requirements or salary provisions of a Technical or Configuration Analyst beyond one sentence in Cahill's Affidavit stating that his work in these positions was similar to his work as a business analyst. Fidelity submitted detailed affidavits indicating that these positions require specialized technical knowledge that other analyst positions do not. *See* Affidavit of Anthony Rigo ("Rigo Aff.") at ¶ 6; Affidavit of Keith Maden ("Maden Aff.") at ¶¶ 5, 8; Affidavit of Steve Gilchrist ("Gilchrist Aff.") ¶ 9. Fidelity asserts that Configuration and Technical Analysts (or "Technical Design Analysts" as referred to by Fidelity) have a salary grad-

---

**6.** Arch did not indicate her salary while at Fidelity.

ing structure different from the other Analyst positions—being categorized as T-grades, "[to] reflect[ ] the highly technical nature of the position." Gilchrist Aff. ¶ 6. Fidelity also indicated that Configuration Analysts are subdivided into "Implementation," "Conversion," and "Ongoing Support Configuration Analysts" with varying responsibilities between these subcategories. Maden Aff. ¶ 9. In the face of evidence to the contrary, one sentence about the job responsibilities of Technical and Configuration Analysts is insufficient to warrant a finding that these positions are situated similarly to other analyst positions. Cf. *Kim Son Restaurant*, 286 F.Supp.2d, at 811, n. 9 (allowing notice for a class of bus staff, cooks, and dishwashers but denying notice to janitors employed by the restaurant where plaintiff only mentioned them in passing and defendant submitted evidence that they were employed by an independent company).

■ The Employees made a sufficient showing that employees in the remaining analyst positions—Business Analyst, Project Analyst and Reporting Analyst—are similarly situated. Different job titles or positions do not preclude a finding that plaintiffs are "similarly situated." *See Baldozier v. Am. Family Mutual Ins.*, 375 F.Supp.2d 1089, 1092–93 (D.Colo.2005) (granting conditional certification for all vehicle damage claim representatives who were treated as exempt and denied overtime pay where named plaintiffs submitted affidavits asserting that all of these representatives have the same job function re-

gardless of location or specific title). Fidelity argued that the class is not similar because there are dissimilarities between the various analyst positions. Def.'s Opp'n to Mot. for Conditional Certification [Doc. No. 26] ("Def.Cert.Opp.") at 15–17; *see* Affidavit of Paul Lavertu ("Lavertu Aff.") ¶¶ 6–9; Affidavit of Elise McCaffrey ("McCaffrey Aff.") ¶¶ 6–11; Affidavit of Erica Piesz ("Piesz Aff.") ¶ 7–8. Although there are clear differences between these three positions, there are sufficient similarities to have warranted a finding, at this initial phase, that these positions are similarly situated. The Employees' affidavits pointed to data collection and data entry as the primary duties of each position, indicating little analysis and very little client contact in the respective positions. *See* Trezvant Aff. ¶¶ 3–4, 7; Cahill Aff. ¶¶ 3–5, 8; Piche Aff. ¶ 3–4. Fidelity challenged that these were accurate depictions of these positions, asserting that the analysts have much more varied and complex responsibilities. Def. Cert. Opp. at 16; *see* McCaffrey Aff. ¶ 6–9; Piesz Aff. ¶ 7; Lavertu Aff. ¶ 6. This, however, goes to credibility—something that is not given consideration at this phase. Further, the affidavits submitted by Fidelity did support the contention that all three types of analysts are involved in some form of data collection and data entry.[7]

Fidelity also argued that the Employees are not similarly situated because the named plaintiffs worked in only one division of Fidelity Corp., and none of them worked there in 2004 when the divisions

---

7. Fidelity personnel indicated that a Reporting Analyst "conduct[s] sophisticated ad hoc querying of client data in response to client service needs and to diagnose data problems." Piesz Aff. ¶ 7. One of the duties of a Project Analyst, according to Fidelity personnel, is to "work with databases containing client information and conduct ad hoc querying, data and trend analysis, and root cause analysis to solve data problems." McCaffrey

Aff. ¶ 6. The description of a Business Analyst's duties provided by Fidelity, though more abstract, includes "translat[ing] business requirements into functional and technical design documents" (HR Payroll Business Analysts), Lavertu ¶ 6; gathering and documenting functionality requirements of a client (Health and Welfare Business Analysts), *id.* ¶ 7; and generally being familiar with data-oriented tasks, *id.* ¶ 8.

were restructured. Def. Cert. Opp. at 15–16, 18. According to Fidelity, Fidelity Corp. has four primary product lines: Health and Welfare plans, including health insurance, Defined Benefit plans, Defined Contribution plans, and Human Resources/Payroll. *Id.* at 2. Kyle Kane, Director of Management Effectiveness for Fidelity, stated that until 2004, the company was organized according to these product lines, with teams in each of the four product divisions consisting of the various types of analysts (business, technical) within the company.[8] Affidavit of Kyle Kane ("Kane Aff.") ¶ 7. Kane further asserted that the duties of the individual team members depended on the client to which the team was assigned, as well as the project managers, directors and vice-presidents who were assigned to manage and supervise the team. *Id.* In 2004, according to Kane, Fidelity Employer Services was restructured and a new organization called Fidelity Human Resources Services was created within Fidelity Corp.; this new entity re-organized along functional rather than product lines—namely, Implementation, Operations, Technology, and Process Engineering. Kane Aff. ¶¶ 6,8. According to the company, this meant that whereas before teams "clustered in relative isolation around one or several clients" and "performed duties tailored to varying client requirements," now employees are categorized according to specific functions and their duties "have become more focused on those functions, instead of on all aspects of particular clients' needs." Def. Cert. Opp. at 3–4.

Though Fidelity described the changes in the organization structure at Fidelity Corp. after the restructuring, it failed to illustrate how these changes affected the duties of the analyst-types now in issue—business, reporting, and project—so as to have precluded an initial finding by the Court that analysts before and after the restructuring are similarly situated. Kane described changes that relate to the organization of work—whereas work was formerly coordinated on a team-level based on client needs and is now coordinated within broader function-oriented divisions, Kane Aff. ¶¶ 7–8—and did not discuss any changes in the particular duties of the analysts. None of the other affidavits submitted by Fidelity describing the duties of these analysts discussed any change in those duties after the restructuring of divisions. Absent a showing to the contrary, the Court considered the Employees' descriptions of the job duties of the various analysts relevant to the period after the restructuring.

The Court also rejected, at that stage, Fidelity's contention that because the affiants for the Employees only worked in one division of the company, the Employees could not establish that analysts across divisions are similarly situated. According to Kane—Trezvant, Cahill, Piche, and Arch all worked in the Health and Welfare division when they were analysts for Fidelity Corp. Kane Aff. ¶¶ 27, 33, 40. Cahill, Trezvant, and Arch, however, based on their personal knowledge, stated that the "primary duties and tasks" of the analysts were essentially the same across divisions. Arch Aff. II ¶ 3; Trezvant Aff. II ¶ 10; Cahill Aff. II ¶ 17. The only affidavit submitted by Fidelity that described difference in the duties of analysts based on their division was the Lavertu affidavit which discussed the duties of Business An-

---

8. Specifically, Kane stated that, prior to the reorganization, a Fidelity Corp. Vice President located in Merrimack was responsible for coordinating the assignment of multiple team members to several Directors; Directors coordinated the management of the clients' work with the assistance of Project Managers; Project Managers coordinated teams comprised of a mixture of the various analyst-types. Kane Aff. ¶ 7.

alysts in various divisions. *See* Lavertu Aff. ¶ 6–8. Since both Trezvant and Arch made representations to the contrary, the Court found that the Employees made a sufficient showing that Business Analysts in different divisions have the same primary duties and tasks. A more critical evaluation of the class based on different factual and employment settings (i.e., divisions) would have been made in the second "decertification" stage, should that point in the litigation have been reached. *See Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir.2001).

The Employees also provided sufficient evidence to indicate that their pay provisions are similar, indicating that the analyst-types in issue all receive a flat wage and do not receive overtime pay. Fidelity argued that different compensation grades within an analyst position (higher grades reflecting higher degrees of sophistication) preclude class certification. *See* Def. Cert. Opp. at 17. Fidelity, however, did not identify any different compensation grades for Business Analysts, and, while an affidavit identifies two different grades for Reporting Analysts, *see* Piesz Aff. ¶ 5, it did not discuss distinctions based on those grades. According to Fidelity, the Project Analyst position is graded and consists of Project Analysts, Senior Project Analyst, and Project Analyst Team Leader, the latter two having managerial and supervisory responsibilities.[9] *See* McCaffrey Aff. ¶ 12. Given these uncontradicted distinctions in level of responsibility, the request for certification was limited to "Project Analysts" alone, and not "Senior" or "Team Leader Project Analysts".

**D. Sufficiency Of The Employees' Factual Support For Their Legal Claims of Misclassification and Denial of Overtime Pay**

▮ The Employees showed that the remaining analysts—Business, Reporting, and Project Analysts—are also similarly situated with regards to legal claims. Trezvant, Cahill, and Arch identified a practice in which analysts were told that they were not entitled to overtime pay and promised by the company that, instead, they would receive comp time for the long hours they worked. Arch Aff. II ¶ 5; Trezvant Aff. II ¶ 12; Cahill Aff. II ¶ 19.

The supplemental affidavits of Trezvant, Cahill, and Arch made a showing, albeit "modest" that other Analysts worked long hours and were dissatisfied with the Fidelity's policy of allowing comp time in lieu of overtime pay. *See* Arch Aff. II ¶ 5; Trezvant Aff. II ¶ 12; Cahill Aff. II ¶ 19. While Trezvant specifically referred only to the business analysts with whom she worked in making this observation, *see* Trezvant Aff. II ¶ 12, Cahill and Arch referred more generally to "analysts [they] worked with," *see* Cahill Aff. II ¶ 19, Arch Aff. ¶ 5. According to Fidelity's own description of its organizational structure, different types of analysts worked together in teams. Kane Aff. ¶ 7, 8. Therefore, the Court regarded the reference made by Cahill and Arch as referring to different types of analysts. Based on these representations, the Court concluded that the Employees made a satisfactory showing regarding the legal claim of misclassification as to Business Analysts, Reporting Analysts, and Project Analysts.[10]

---

9. Fidelity also submitted affidavits discussing the different grades in the Technical Analyst position—Technical Design Analyst, Associate, Senior, Principal, and Consultant. *See* Gilchrist Aff. ¶ 6.

10. For a similarly situated showing as to the claim of unpaid overtime based on misclassi-

fication, some courts focus primarily on the job duties of the potential plaintiffs insofar as those duties relate to whether they were correctly classified. *See, e.g., Scholtisek v. The Eldre Corp.*, 229 F.R.D. 381, 389 (W.D.N.Y. 2005); *Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1271 (M.D.Ala.2004) ("[T]he 'similarly

The Employees failed to show that Fidelity's policies regarding the classification of Analysts are company-wide, including offices beyond Merrimack, New Hampshire. Fidelity made no admission that they classify all analysts as exempt. *See Masson v. Ecolab*, No. 04–Civ–4488, 2005 WL 2000133, at *14, 2005 U.S. Dist. LEXIS 18022, at *40–41 (S.D.N.Y. Aug. 17, 2005) ("Substantial allegations ... as well as an admission by defendants that such actions reflect a company-wide policy, sufficiently demonstrate a factual nexus between plaintiffs' situation and other potential class members...."). Further, the affidavits were all from employees that worked in the company's New Hampshire office. None of the Employees submitting affidavits purported to know the policies of other branches of the company. *See Threatt v. CRF First Choice*, 05–CV–117, 2005 U.S. Dist. LEXIS 16903, at *16–18 (N.D.Ind. Aug. 12, 2005) (rejecting a nationwide conditional collective action where plaintiffs provided no evidence of policies and job requirements of employees in other states and certifying the class only as to the one office for which the requisite evidence was submitted). The Employees, therefore, lacked the sufficient factual showing necessary to establish that all the analysts in the company are subject to a common policy.[11] Certification was therefore limited to the Merrimack, New Hampshire group of analysts.

### E. The Named Plaintiffs As Representatives For The Collective Action

■ Fidelity argued that three of the named plaintiffs are not members of the class the Employees seek to certify based on statute of limitations requirements. Def. Cert. Opp. at 19. Under the Fair Labor Act, an action for unpaid compensation must commence within two years after a cause of action accrues and three years if the cause of action arises out of a willful violation. 29 U.S.C. § 255(a). Fidelity asserts because Cahill's and Arch's claims accrued more than two years ago[12] and are, therefore, within the statute of limitations only if the Employees establish a willful violation of the Fair Labor Act, they cannot be considered members of the class. Def. Cert. Opp. at 20. The Court does not make a determination of willfulness at this stage and should therefore assume that the longer three-year statute of limitations applies. *Roebuck v. Hudson Valley Farms, Inc.*, 239 F.Supp.2d 234, 240 (N.D.N.Y.2002). Cahill's and Arch's claims are, at this point, presumed valid and, as such, they are members of the Employees' class.

Fidelity, however, correctly argued that Piche is not a member of this class. Def. Cert. Opp. at 19. Though the company's argument was based on the fact that Piche's claim falls outside of the three-year statute of limitations for the Fair Labor Act,[13] *Id.*, even more fundamentally,

---

situated' inquiry in this case must be analyzed in terms of the nature of the job duties performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt."); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F.Supp.2d 493, 498 (D.N.J.2000) (same).

**11.** The Employees cited *Belcher v. Shoney's*, 927 F.Supp. 249, 252 (M.D.Tenn.1996), among other cases, for the proposition that different geographic locations are immaterial to a "similarly situated" determination at this

phase. In *Belcher*, however, the plaintiffs submitted 24 affidavits from employees in the defendant's restaurants in ten different states. *See id.*

**12.** Arch and Cahill were both employed at Fidelity until the end of 2002. Arch Aff. ¶ 1; Cahill Aff. ¶ 1.

**13.** Fidelity has filed a motion to dismiss Piche from this action. *See* Mem. in Supp. of Mot. to Dismiss Count II of Pl.'s First Am. Compl. [Doc. No. 17] ("Def. Dismiss Mem.") at 9.

the Employees' own definition of the class excluded Piche as a class member. The Employees sought certification of a class of those analysts employed by Fidelity "within three years before the commencement of this action." Pl. Mot. at 1; *See* Proposed Notice at 1 (proposing notice to all analysts employed any time on or after April 5, 2002). By Piche's own account, she was last employed at Fidelity in January 2002, Piche Aff. ¶ 1, though Fidelity stated that her employment terminated in November 2001, Kane Aff. ¶ 37. The Employees suggested that because the standard for certification of a Section 216 collective action is less stringent than that for a Rule 23 class action, a named plaintiff does not necessarily have to be a member of the collective action. Pl.'s Reply to Br. in Supp. of Pl.'s Mot. for Conditional Collective Certification [Doc. No. 28] ("Pl.Rep.") at 14–15 ("Defendants' assertion that a named plaintiff in an FLSA claim must be a member of the class ... is unsupported by the relevant case law."). The purposes of a Section 216(b) *representative* action, however, are undermined when non-class members are allowed to serve as representatives. *Cameron–Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1248 (11th Cir.2003). ("Congress's aim in adding the 'opt-in' language to § 216(b) was to prevent large group actions, with their vast allegations of liability, from being brought on behalf of employees who had no real involvement in, or knowledge of, the lawsuit.... Thus, the [Fair Labor Act] prohibit[s] what precisely is advanced under Rule 23—a representative plaintiff filing an action that potentially may generate liability in favor of uninvolved class members." (citations and internal quotation marks omitted)). Under Section 216(b) "the named plaintiff does not have the right to act in a role analogous to the private attorney general concept." *Id.* at 1249 (holding that a named plaintiff has no procedural right under the Fair Labor Act to represent other plaintiffs in a collective action when he has settled all his personal claims). Piche, therefore, cannot be a named plaintiff in this action.

Even though Piche is not a class member, she asserted that she was employed at Fidelity as a Project Analyst from October 2000 until January 2002, Piche Aff. ¶ 1, and provided sufficient factual basis for determining that Project Analysts are similarly situated with relation to each other and the entire Employee class. Fidelity submitted evidence that Project Analysts are now structured to work in teams within Operations: a client-focused team, a functional team, and a centralized team—a change which appears to have resulted from the 2004 restructuring of the company. *See* McCaffrey Aff. ¶ 10. Fidelity did not submit evidence that the duties of the Project Analyst have changed due to this restructuring, describing only organizational changes.[14] *See id.* Piche's affidavit can, therefore, be used as evidence that the plaintiffs are similarly situated.

The Employees have, in the context of the motion to dismiss, asked the Court to revisit this ruling dismissing Piche as a named plaintiff, arguing that the affidavit by Kyle Kane, submitted by Fidelity, raised an issue of fact as whether Piche claims fall outside the statute of limita-

---

**14.** These positions are described as follows:

The Client–Focused Project Analysts have client specific expertise and can perform all project related functions for the client they support. The Functional Project Analyst focus on issues related to one process, such as Payroll or Net Benefits ... set up, but can perform that function for any client. Central Team Project Analyst can also support any client, but their work tends to focus on ad hoc database reports and querying, performing data analysis and applying data updates to the record keeping system. McCaffrey Aff. ¶ 10.

tions. Pl. Dismiss Opp. at 17. The Employees amended complaint and Piche's affidavit both state that she was last employed at Fidelity in approximately January 2002, outside the statute of limitations.[15] Am. Compl. ¶ 11; Piche Aff., ¶ 1. Kane's affidavit states that Piche's employment terminated in November 2001, and then states that "Ms Piche has not worked for any of the Defendants in any capacity from April 5, 2002"—the beginning date of the applicable statute of limitations time period. Aff. of Kyle Kane, ¶¶ 37, 38. The Employees suggest Kane's reference to the April 5th date raises doubt as to whether Piche is barred by the statute of limitations. Pl. Dismiss Opp. at 17. Kyle's statements do not raise an issue of fact, as he, in referring to the April 5th date, was only indicating that Piche had not worked for Fidelity during the statute of limitations period. He did not state that April 5, 2002 was Piche's last day of work and the Employees and Piche confirm that her last day of work was approximately January 2002. The Court, affirms its ruling dismissing Piche as a named plaintiff.

## III. New Hampshire Wage Law Claim & Rule 23 Class Certification

### A. Background Relevant To The New Hampshire Wage Law Claim

The following recitation of facts is taken from the Employees' Amended Complaint. For purposes of this Motion to Dismiss, the Court must take the allegations in the Employees' complaint as true and draw all reasonable inferences in their favor. *Citibank v. Grupo Cupey, Inc.*, 382 F.3d 29, 31 (1st Cir.2004) (quoting *TAG/ICIB Servs. v. Pan Am. Grain Co.*, 215 F.3d 172, 175 (1st Cir.2000)).

The Employees were salaried employees for Fidelity who worked overtime hours but were never paid overtime wages. Am. Compl. ¶ 27. They worked in positions with the "Analyst" job titles—Business Analyst, Technical Analyst, Configuration Analyst, Project Analyst, Reporting Analyst—and were classified based on their position as exempt from the overtime pay requirements of the Fair Labor Act. *Id.* ¶ 1,2. The Employees, however, were improperly classified as exempt and are, in fact, non-exempt and entitled to overtime pay. *Id.* ¶ 1.

### B. Standard of Review

As this Court has noted, a motion to dismiss under Rule 12(b)(6) tests the sufficiency of the plaintiff's pleadings and, as a result, must be considered in light of the liberal notice pleading requirements of the Federal Rules. *See Andrews–Clarke v. Lucent Techs.*, 157 F.Supp.2d 93, 98 (D.Mass.2001) (Dein, M.J.). Accordingly, a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (emphasis added) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Rogan v. Menino*, 175 F.3d 75, 78 (1st Cir.1999) (noting that the plaintiff must "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery"). Moreover, "the Court must accept as true all of the allegations made in the complaint and draw all reasonable inferences in the plaintiff's favor." *Baker v. Coxe*, 940 F.Supp. 409, 414 (D.Mass.1996) (Saris, J.) (citing *Coyne v. City of Somerville*, 972 F.2d 440,

---

**15.** Though the four corners of the complaint are typically the only information considered on a motion to dismiss, Piche's standing as a named plaintiff implicated issues of class certification, which is why her dismissal was raised at the prior hearing.

442–3 (1st Cir.1992)); *see also, Conley,* 355 U.S. at 45–46, 78 S.Ct. 99. The standard for dismissal, however, is not without any bite. In taking the plaintiff's allegations as true, the Court is not obliged to credit "bald assertions" or "unsubstantiated conclusions." *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir. 1989).

## C. The Employees Cannot Assert A Claim Under New Hampshire Wage Law

The Employees alleged that, under New Hampshire wage law, they are entitled to overtime pay due under the Fair Labor Act. New Hampshire state law does not entitle the Employees to overtime pay. New Hampshire specifically excludes employers covered under the Fair Labor Act from its overtime wage requirement. N.H.Rev.Stat. Ann. § 279:21 (2005) (providing that employees "be paid at the rate of time and one-half for all time worked in excess of 40 hours in any one week," *unless* the employees worked for an employer "covered under the provisions of the federal Fair Labor Standards Act of 1938").

The Employees, therefore, argued that they are not seeking overtime pay entitled to the Employees under this state statute; they seek recovery under state law for federal overtime pay entitled to the employees under the Fair Labor Act. In their complaint, they paraphrased a New Hampshire statute that requires every employer to pay *"all wages due* to employees within 8 days including Sunday after expiration of the week in which the work is performed" or in some cases "less frequently than weekly except that it shall be at least once each calendar month." Am. Compl. ¶ 25 (emphasis in original); N.H.Rev.Stat. Ann. § 275:43; *Weekly* (containing this language). The Employees also referenced the language of another New Hampshire wage statute asserting that under New Hampshire law "[w]henever an employer

discharges an employee, the employer shall pay the employee's wages in full within 72 hours," and "[w]henever an employee quits or resigns, the employer shall pay the employee's wages no later than the next regular payday...." Am. Compl. ¶ 25; N.H.Rev.Stat. Ann. § 275:44, *Employees Separated From Payroll Before Pay Days* (containing this language). The complaint then concluded that under these laws, an employer is required to pay all wages due, including all overtime wages due under federal or state law. Am. Compl. ¶ 25.

The Employees alleged that Fidelity violated New Hampshire law by not paying them overtime wages that were due to them under the Fair Labor Act. *See* Pl. Dismiss Opp. at 2. This state claim is, in essence, completely duplicitous of the claim brought directly under the Fair Labor Act; except of course that the Fair Labor Act/New Hampshire wage claim, brought as a Rule 23 class action, is now not subject to the Fair Labor Act's requirement that employees affirmatively opt-in to a collective action. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any [collective] action unless he gives consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

Fidelity argued that N.H.Rev.Stat. Ann. § 275:43 does not allow for recovery of federally mandated overtime pay because "overtime" is not "wages" for purposes of state law. Def. Dismiss Mem. at 4. New Hampshire defines "wages" as

compensation, including hourly health and welfare, and pension fund contributions required pursuant to a health and welfare trust agreement, pension fund trust agreement, collective bargaining agreement, or other agreement adopted for the benefit of an employee and agreed to by his employer, for labor or services rendered by an employee,

whether the amount is determined on a time, task, piece, commission, or other basis of calculation

N.H.Rev.Stat. Ann. 275:42(III). Fidelity asserted that based on this definition, wages are compensation due to employees pursuant to an employment agreement, and not something statutorily mandated like overtime. Def. Dismiss Mem. at 4. The Employees countered by arguing that New Hampshire regulations related to wage law incorporate portions of the Code of Federal Regulations which discuss overtime pay. Pl. Dismiss Opp. at 5. The regulation entitled "Hours Worked" provides:

> For the purpose of determining "all wages due" for hours worked in accordance with RSA 275:43 I, the department of labor, under the authority provided by RSA 275:54, incorporates the "Wage and Hour Publication 1312, Title 29 Part 785 of the Code of Federal Regulations, United States Department of Labor."

N.H.Code Admin. R. Ann. 803.05 (2005). This section of the Code of Federal Regulations is also entitled "Hours Worked," and of its approximately 50 subsections, the Employees pointed to two as evidence that New Hampshire intended to include overtime wages required by the Fair Labor Act. Pl. Dismiss Opp. at 6. These provisions state:

> 785.5 General requirements of sections 6 and 7 of the Fair Labor Standards Act. Section 6 requires the payment of a minimum wage by an employer to his employees who are subject to the Act. Section 7 prohibits their employment for more than a specified number of hours per week without proper overtime compensation.

29 C.F.R. § 785.5; Principles for Determination of Hours Worked; "785.49 Applicable provisions of the Fair Labor Standards Act. [Section 7] provides that persons may not be employed for more than a stated number of hours a week without receiving at least one and one-half times their regular rate of pay for the overtime hours." 29 C.F.R. § 785.49(b); Miscellaneous Provisions.

Fidelity responded that the New Hampshire regulation cited by the Employees relates to the calculation of hours worked. Def.'s Reply Mem. in further Supp. of their Mot. to Dismiss [Doc. No. 38] ("Def. Dismiss Rep.") at 2. Similarly, the federal regulation it incorporates by reference also relates to the determination of hours worked. *Id.* Fidelity argued that "[the] reference to the federal regulation governing the calculation of hours worked does not import the entire federal overtime pay scheme into New Hampshire law." *Id.*

■ The term "wages" as defined by New Hampshire expressly excludes compensation that is not the product of an agreement. The references in the federal regulations identified by the Employees cannot overcome this explicit limitation. The Introductory Statement to the federal regulation Section 785 on which the Employees rely, states the following:

> Section 6 of the Fair Labor Standards Act ... requires that each employee, not specifically exempted, who is engaged in commerce, or in the production of goods for commerce, or who is employed in an enterprise engaged in commerce, or in the production of goods for commerce receive a specified minimum wage. Section 7 of the Act ... provides that persons may not be employed for more than a stated number of hours a week without receiving at least one and one-half times their regular rate of pay for the overtime hours. *The amount of money an employee should receive cannot be determined without knowing the number of hours worked. This part discusses the principles involved in determining what constitutes working time. It also seeks*

to apply these principles to situations that frequently arise. It cannot include every possible situation. No inference should be drawn from the fact that a subject or an illustration is omitted.

29 C.F.R. § 785.1; Introductory Statement (emphasis added). The regulation then goes on to construe terms such as "hours worked"; discuss the nuances of "waiting time," "rest and meal periods," and "travel time," and outlines provisions for recording working time. *See generally* 29 C.F.R. § 785. It is, therefore, reasonable to conclude that New Hampshire intended to make use of the various constructions and definitions regarding hours worked provided by this regulation and apply them to its state wage law, not to broaden its definition of "wages" to include federally mandated overtime.

This reasoning is bolstered by the fact that the Employees could not identify one New Hampshire case—state or federal-in which plaintiffs sought a recovery of federally mandated overtime under the state statutes they referenced.[16] In contrast to the implied incorporation of federally mandated overtime pay that the Employees argued was the state's intent, New Hampshire has explicitly incorporated the federal minimum wage into its wage law, providing that no employer shall employ anyone at "an hourly wage lower than that set forth in the federal minimum wage law" or the state's own minimum hourly rate, whichever is higher. N.H.Rev.Stat. Ann. 279:21 (2005).

Given the definition of wages provided by the state statute and the absence of state case law supporting plaintiff's position, the Court ruled that an action for federally mandated overtime cannot be had under the New Hampshire Wage law.

## D. Even If This Claim Were Viable, A Rule 23 Class Action Is Not The Appropriate Vehicle For This Claim

1. New Hampshire Wage Law May Not Allow Employee Class Actions

■ New Hampshire wage law provides:

Action by an employee to recover unpaid wages and/or liquidated damages may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves, or such employee or employees may *designate* an agent or representative to maintain such action..

N.H.Rev.Stat. Ann. 275:53(I); Employees' Remedies (2005) (emphasis added). Whether this language allows for a class action is unclear; it is clear, however, that the Employees did not pointed to a case, in state or federal court, where New Hampshire wage claims have been brought as a class action.[17] The New Hampshire Supreme Court does adhere to the maxim *expressio unius est exclusio alterius* (the express mention of one thing implies the exclusion of others) in interpreting statutes granting standing and have limited

---

**16.** The Employees generally cited New Hampshire caselaw in support of the proposition that Chapter 275 and Section 275.53 (Employee remedies statute) in particular must be construed so as to "effectuate the broad purpose of protecting employees." Pl. Dismiss Opp. at 3 (quoting *Galloway v. Chicago–Soft, Ltd.*, 142 N.H. 752, 713 A.2d 982 (1998)).

**17.** Fidelity cited *Labor Ready N.E., Inc. v. New Hampshire Dep't of Labor*, 147 N.H. 721, 723,

798 A.2d 48 (2002), for the proposition that the statute does not authorize representative actions. Def. Dismiss Mem. at 6. The court's decision in *Labor*, relates to a different provision of the statute which specifically states that the commissioner (and the Department of Labor as his designee) can only bring an action on behalf of an employee upon "express assignment from the employee." 147 N.H. at 723, 798 A.2d 48; *See* N.H.Rev.Stat. Ann. 275:53(II).

standing to individuals enumerated in the governing statute. Def. Dismiss Mem. at 6, n. 12; *St. Joseph Hosp. Of Nashua v. Rizzo*, 141 N.H. 9, 11–12, 676 A.2d 98 (1996) (holding third party creditors lacked standing where the statute specifically enumerated parties empowered to sue); *In re Guardianship of Raymond E.*, 135 N.H. 688, 691, 609 A.2d 1220 (1992) (holding that only the individuals listed in the statute have standing to petition for guardianship). Interpreting statute 275:53 strictly would limit standing to the employee/employees or their designee.

The Employees, citing *Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), argued that, in the absence of an express intention by New Hampshire to prohibit class relief under its wage statute, the claim should be allowed. Pl. Dismiss Opp. at 8; *Califano*, 442 U.S. at 700, 99 S.Ct. 2545 ("In the absence of a direct expression by Congress of its intent to depart from the usual course of trying 'all suits of a civil nature' [quoting Fed.R.Civ.P. 1] under the [r]ules established for that purpose, class relief is appropriate. . . ."). *Califano* involved a federal statute that did not enumerate the parties who could bring a suit, but stated that "any individual" may seek review of an agency decision by civil action. *Califano*, 442 U.S. at 698 n. 12, 99 S.Ct. 2545 (discussing 42 U.S.C. § 405(g)). The Supreme Court ruled that "[s]ection 205(g) contains no express limitation of class relief." *Id.* at 699, 99 S.Ct. 2545. The New Hampshire statute may contain such an express limitation. The wording of the statute and the lack of class action employee wage lawsuits in New Hampshire leaves a significant degree of doubt as to whether class actions are allowed.

2. The Fair Labor Act Definitely Does Not Allow Federal Overtime Claims To Be Brought As A Rule 23 Class Action

The Fair Labor Act provides that:

> Any employer who violates the provisions of section 206 and 207 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. . . . An action to recover the liability prescribed . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added). Certainly the Fair Labor Act states clearly that actions brought for violation of the Act cannot be brought as class actions. *See Cameron–Grant*, 347 F.3d at 1248 (discussing Congress's intent to prevent Rule 23 class actions in adding the "opt-in" language). Though the Employees bring a state-law claim, it is an action to recover unpaid federally mandated overtime compensation. As such, it must be brought pursuant to the procedures in Section 216.

The Employees referenced a number of cases where claims under state wage laws and the Fair Labor Act were brought together in an action. Pl. Dismiss Opp. at 12–16. They cite *McLaughlin v. Liberty Mutual Ins. Co.*, 224 F.R.D. 304 (D.Mass. 2004) (Keeton, J.), for the proposition that there is no reason to infer from the Fair Labor Act's restriction on federal remedies "a concomitant restriction on state remedies." *Id.* at 308. In *McLaughlin*, however, the district court noted that the "FLSA action and state law remedies are *entirely separate rights*[18] that may be pursued by

18. The plaintiffs in *McLaughlin* were seeking to recover overtime pay under the Fair Labor

plaintiffs." *Id.* (emphasis added). The case law cited by the Employees presumes an independence between the two claims. *See, e.g., Goldman v. RadioShack Corp.,* No. 2:03–CV–0032, 2003 WL 21250571, at *2, 2003 U.S. Dist. LEXIS 7611, *6 (E.D.Pa. Apr. 16, 2003) (exercising supplemental jurisdiction over state claims, noting that Fair Labor Act and the state wage act, Pa. Stat. Ann. 43 § 104(c), *both* "require overtime pay for each hour in excess of forty hours per week that the employee works"); *Beltran–Benitez v. Sea Safari,* 180 F.Supp.2d 772, 773–74 (E.D.N.C.2001) (exercising supplemental jurisdiction over claims of improper deductions of certain wage amounts under the North Carolina law where plaintiffs also alleged failure to pay overtime under the Fair Labor Act; finding that the Fair Labor Act does not bar application of Rule 23 to a *separate cause of action); Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81, 84–5, 88 (S.D.N.Y.2001) (granting Rule 23 class certification based on plaintiffs' allegations that they were not paid minimum wage, overtime premium pay, or "spread of hours" compensation in violation New York's Minimum Wage Act, N.Y. Lab. L. § 650 et seq., where plaintiffs also claimed violations of the Fair Labor Act); *Ladegaard v. Hard Rock Concrete Cutters,* No. 00 C 5755, 2000 WL 1774091, at *1, *2, 2000 U.S. Dist. LEXIS 17832, *1, *7 (N.D.Ill.Dec. 1, 2000) (granting Rule 23 class certification to claims of Illinois minimum wage and reporting violations where plaintiff also alleged Fair Labor Act violations). The state law claims asserted in these cases are not akin to the Employees' "state law" claim that they ought have received federal overtime.

Act and Massachusetts law. 224 F.R.D. at 306. Though not cited in the opinion, the Massachusetts law claim relates to a statute governing the payment of overtime compensation. *See* Mass. Gen. Laws Ann. ch. 151 § 1A; *see* Def. Rep. at 7, n. 7 (confirming

The Court therefore ruled that, under the provisions of the Fair Labor Act, even if the Employees had a viable claim under New Hampshire Wage Law for federally mandated overtime, this claim could not be brought as a Rule 23 class action.

## IV. CONCLUSION

Accordingly, Fidelity's Motion to Dismiss Count II of the Amended Complaint [Doc. No. 16] was ALLOWED.

SO ORDERED.

from the docket that the state claims were asserted under chapter 151). Unlike New Hampshire's statute, employers covered under the Fair Labor Act are not exempt from this provision. *See* Mass. Gen. Laws ch. 151, § 1A.