Tamara BARRUS, et al., Plaintiffs,

v.

**DICK'S SPORTING GOODS, INC. and Galyan's Trading Company, Inc., Defendants.**

No. 05–CV–6253.

United States District Court,
W.D. New York.

Sept. 19, 2006.

Patrick J. Solomon, Graig F. Zappia, Michael J. Lingle, Dolin, Thomas & Solomon LLP, Rochester, NY, for Plaintiffs.

Christopher P. Schueller, Buchanan Ingersoll & Rooney PC, Buffalo, NY, Daniel J. Moore, Brian Laudadio, Paul J. Yesawich, III, Harris Beach LLP, Pittsford, NY, Defendants.

## DECISION AND ORDER

FELDMAN, United States Magistrate Judge.

### *Preliminary Statement*

Plaintiffs are current and former employees of defendants Dick's Sporting Goods (DSG) and Galyan's Trading Company (Galyan's), who allege that defendants violated various wage and hour requirements of the Fair Labor Standards Act (FLSA). Before the Court are plaintiffs' motions to (1) amend the complaint to add two additional classes of plaintiffs

(Docket # 13), (2) compel defendants to produce identifying information on individuals who meet the class descriptions set forth in the amended complaint (Docket # 30) and (3) provide court authorized notice to all potential members of the class pursuant to the "opt-in" provisions of the FLSA (Docket # 16).

### Factual Summary

Defendants DSG and Galyan's are national sporting goods retailers who merged in 2004 and currently operate under the DGG name. DSG operates 255 stores in 34 states with approximately 16,000 employees who are subject to the FLSA wage and hour requirements. *See* Affidavit of Michelle Falce (Docket # 43) at pages 1–2.

According to plaintiffs, DSG and Galyan's implemented formal and informal wage and hour policies which were in direct contravention of the protections afforded employees under the FLSA. Specifically, plaintiffs have identified three different policies utilized by defendants which allegedly violate the FLSA.

*1. Automatic Deduction Policy (Class 1):* According to plaintiffs, defendants maintain a policy "which automatically deducts time from employees when employees do not clock out for a lunch break." *See* Plaintiffs' Memorandum of Law (Docket # 17) at page 3. The result of this policy was that employees who worked through their lunch and failed to "clock out" lost time for which they otherwise should have been compensated. In support of this claim, plaintiffs have submitted affidavits from a number of former employees of defendants who confirmed the existence of the policy. For example, plaintiff Barrus avers that as a former hourly employee and salaried manager of the defendants' store in Henrietta, New York she had personal knowledge of the automatic deduction policy in both the Henrietta store and the Greece, New York store. *See* Affidavit of Tamara Barrus (Docket # 19).

Barrus stated that because the stores were understaffed, employees were needed to work through their scheduled lunch breaks, had their scheduled lunch breaks interrupted to resume work or were prohibited from taking a lunch break. *Id.* at ¶ 7, 11–13. According to Barrus, the defendants also had a policy of "adjusting" shortened lunch breaks. *Id.* at ¶ 27. "For example, if an employee only took 25 minutes for lunch, but was scheduled to take a full hour for lunch, an additional 35 minutes would be subtracted from the employee's compensation for the day." *See* Barrus Affidavit at ¶ 15. Similarly, Michael T. D'Agostino, a former manager at DSG Greece store claimed that he was trained to review the hours employees worked and make "automatic" lunch hour deductions. "If employees did not clock out for a lunch break, I was *trained* to make a deduction from the employees' hours for the day to reflect the scheduled lunch break *in accordance with company policy.*" *See* D'Agostino Affidavit, ¶ 11 (Docket # 20)(emphasis supplied). Jamie Foehner, a former general manager with both DSG and Galyan's, submitted an affidavit alleging that defendants' stores were "repeatedly understaffed" resulting in employees having to work through their scheduled meal breaks. *See* Foehner Affidavit, ¶ 27 (Docket # 24). According to Foehner, employees "were often not aware of the [automatic deduction] policy" resulting in lost pay for the employee. *Id.* at ¶ 21. Foehner averred that he was never trained about the automatic deduction policy nor "what employees could do to ensure that their time was credited for occasions when they had their time deducted for lunch breaks, even though they had not clocked out." *Id.* at ¶ 11. Carolyn Caulkins, a manager at DSG's Greece, New York store also claimed that employees were never made aware by management that their allocated lunch time was subject to an automatic

deduction and, indeed, she was not even aware of the policy until she became a manager. *See* Caulkins Affidavit, ¶ 18 (Docket # 21). According to Caulkins, who worked for defendants for almost fifteen years, "[m]anagers were not trained about what to tell employees to do about time records when employees worked through their lunches or had lunches interrupted." *Id.* at ¶ 20.

Plaintiffs have submitted affidavits suggesting that the automatic deduction policy, the lack of training and supervision over the policy, and the loss of otherwise compensable time to employees was not limited to the stores in the Rochester, New York area. Ivy Lewis worked in Galyan's Woodbridge, New Jersey store in 2003 and 2004, and claimed that the store was understaffed and that the defendants did not "seem concerned about employees missing breaks and not getting paid for that time." *See* Lewis Affidavit, ¶ 34 (Docket # 23). Although Lewis was permitted a 60 minute lunch break, "[i]t was common for [her] to be prevented from taking a lunch break" because she was required to attend to customer and store needs. *Id.* at ¶ 11. Lewis claimed she was never told of or trained in the "automatic deduction" policy and did not discover that 60 minutes of compensable time was being automatically deducted from her paycheck until another non-management employee told her about the policy months after she started working. *Id.* at ¶ 14–15. Ivy states that other employees were also not aware of the automatic deduction policy or how to "correct" the time deduction when the lunch break was not taken or was interrupted. *Id.* at ¶ 16–18. Jeffrey Little was an hourly employee with defendants for seven years. During that time period (1998–2005), Little worked in defendants' stores in Henrietta, New York, Richfield, Minnesota and Dublin, Ohio. *See* Little Affidavit, ¶ 2–5 (Docket # 22). According to Little, it was common for him to be prevented from taking a lunch break because the stores were "short staffed." *Id.* at ¶ 16. Little stated that for the first five years of his employment he was unaware that defendants were automatically deducting his allocated lunch break from his compensable time and only became aware of the policy from another non-management employee. *Id.* at ¶ 9–12. Little averred that he was never trained about the policy and thus was "not aware" that he could utilize a "correction sheet" to be paid for time that was subject to the automatic deduction. *Id.* at ¶ 30, 32.

Defendants concede that prior to the merger, Galyan's utilized a time-keeping program "whereby employees who worked at least six hours and who failed to clock-out for their meal break automatically had one hour deducted from their pay." *See* Falce Affidavit at ¶ 7. According to defendants, the only way the automatic deduction could be "overridden [was] by submitting a time and attendance correction sheet prepared by the employee and submitted with the concurrence of his or her manager." *Id.* Defendants claim that DSG's payroll system has never employed an automatic deduction feature and that Galyan's automatic deduction policy "did not survive Galyan's merger with DSG." *Id.* at ¶ 21. The DSG payroll system requires employees to use or "swipe" "time badges" when reporting to work, leaving work or taking a meal break. *Id.* at ¶ 9, *citing* DSG's Associate Handbook. Defendants allow that DSG store managers could gain access to employees time records and "modify" their time entries. *Id.* at ¶ 11. Defendants explain that this flexibility is needed "so that employees, through their managers, could account for their time when they failed to clock in and out of work." *Id.* at ¶ 30. However, as to plaintiffs' claims that DSG had a policy of encouraging or permitting managers to adjust the badge swiping entries to conform

to the required meal break periods, defendants deny the existence of such a practice and claim that "DSG has taken corrective action to discipline or terminate the manager" who adjusts payroll entries without the employee's consent. *Id.* at ¶ 31. Defendants also claim that both DSG and Galyan's provide adequate training to employees in the operation of their timekeeping policies through employee handbooks, new employee orientations and training given to managers and supervisors through its home office in Pittsburgh, Pennsylvania. *Id.* at ¶ 9. Defendants have also submitted affidavits from current managerial employees of DSG who contradict many of the factual allegations made in the affidavits submitted by plaintiffs regarding the timekeeping practices and policies of DSG and Galyan's. *See* Affidavits of Jerod Burdsall (Docket # 44) and Richard Zanni (Docket # 45).

*2. Interrupted Lunch Policy (Class 2):* The "Interrupted Lunch Policy" alleged by plaintiffs is factually similar to the Automatic Deduction Policy. In sum, plaintiffs claim that defendants had a practice of (1) allowing their employees to be interrupted during their meal break so as to perform work-related duties and not being paid for the time spent working and (2) expecting or requiring their employees to work through lunch due to being short-staffed and to respond to customer needs. The affidavits submitted by plaintiffs all aver that management was well aware that its employees were being unfairly interrupted during meal breaks and nothing was done to discourage the practice or make sure that the time spent on job related duties during meal breaks would be properly compensated. The affidavits submitted by former employees of defendants aver that employees "were not aware of the policy that their lunch breaks would be deducted even when an employee worked through them." *See* Jeffrey Little Affidavit at ¶ 28. *See also* Ivy Lewis Affidavit at pages 1–3;

Carolyn Caulkins Affidavit at pages 1–3; Michael D'Agostino Affidavit at pages 2–3; Tamara Barrus Affidavit at pages 2–4.

As with the alleged Automatic Deduction Policy, defendants' response essentially denies the existence of the "Interrupted Lunch Policy" or practice and claims that "efforts were undertaken to ensure that employees were not interrupted during meal breaks, but that if they were, they were properly compensated." *See* Michelle Falce Affidavit at ¶ 37.

*3. Comp Time Policy (Class 3):* The affidavits submitted by D'Agostino and Caulkins allege violations of the FLSA overtime rules. Specifically, D'Agostino avers that when employees would work over 40 hours per week, defendants "would often pay the person retro pay or offer comp time in the following week." *See* D'Agostino Affidavit at ¶ 24. D'Agostino, who worked for DSG for over three years, observed defendants engage in this practice "once or twice per month." *Id.* at ¶ 25. Caulkins, who worked for DSG for fifteen years, states that when she worked over 40 hours per week the "[d]efendant would often pay me retro pay at straight times rates in the following week." *See* Caulkins Affidavit at ¶ 21–22. Defendants deny the existence of such a policy or practice and further allege that although the payroll records of Caulkins confirm that she worked overtime on numerous occasions, she was "properly compensated" with overtime pay on each occasion. *See* Falce Affidavit at ¶ 39.

### Discussion

■ Plaintiffs, in the motions before the Court, seek permission to amend the complaint to add classes "2" and "3", to compel defendants to disclose all employees who would potentially be in any of the three named classes and to authorize notice to all the affected employees. All parties agree that the result of granting plaintiffs'

motions would be conditional certification of a collective action under 29 U.S.C. § 216(b).[1] The conditional class would be current and former employees of defendants who fit within the three classes of employees named in the amended complaint and plaintiffs' counsel would be authorized to give notice to these individuals of their right to opt-in to the collective action.

■ The Court's obligation in deciding whether to certify a collective action under the FLSA is not in dispute and has been previously summarized by this Court:

> Courts utilize a two-step approach when certifying collective actions under the FLSA. In the first step, the court examines the pleadings and affidavits of the proposed collective action and determines whether the proposed class members are similarly situated. If the court finds that the proposed class members are similarly situated, the court "conditionally certifies" the class. Putative class members are given notice and the opportunity to "opt in" and the action proceeds as a representative action throughout discovery.
>
> In this early phase, courts employ a relatively lenient evidentiary standard in determining whether a collective action is appropriate. At the notice stage; courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination. To demonstrate that other potential plaintiffs are similarly situated to him, then, a plaintiff must make only a modest factual showing sufficient to demonstrate that he and potential plaintiffs together were victims of a common policy or plan that

violated the law. A plaintiff's burden at this stage is minimal, especially since the determination that potential plaintiffs are 'similarly situated' is merely a preliminary one.

> The second phase of an FLSA collective action inquiry occurs after discovery is largely complete and is typically precipitated by a motion for "decertification" by the defendant. At this stage, the court makes a factual finding on the 'similarly situated' issue, based on the record produced through discovery. If the court finds that the claimants are similarly situated, the collective action may proceed to trial. If the claimants are not similarly situated, the court decertifies the class, and the claims of the opt-in plaintiffs are dismissed without prejudice. The class representatives then proceed to trial on their individual claims.

*Scholtisek v. Eldre Corporation*, 229 F.R.D. 381, 387 (W.D.N.Y.2005)(internal citations and quotations omitted). "This Circuit encourages the sending of notice to 'similarly situated' individuals, as doing so comports with the broad remedial purpose of the FLSA as well as with the interest of the courts in avoiding multiplicity of suits." *Sipas v. Sammy's Fishbox, Inc.*, 2006 WL 1084556, *1 (S.D.N.Y. April 24, 2006)(internal quotation and citation omitted). *See also Hoffmann v. Sbarro, Inc.*, 982 F.Supp. 249, 262 (S.D.N.Y.1997) ("[C]ourts have endorsed the sending of notice early in the proceeding, as a means of facilitating the FLSA's broad remedial purpose and promoting efficient case management.").

■ Here, I find that plaintiffs have made a "modest factual showing" of the

---

1. Although magistrate judges do not have jurisdiction to authorize final certification of a class (*see* 28 U.S.C. § 636(b)(1)(A)), this Court has jurisdiction over motions seeking conditional class certification because they are only preliminary determinations and are not dispositive. *See Patton v. Thomson Corp.*, 364 F.Supp.2d 263, 265–66 (E.D.N.Y.2005).

existence of three common policies or practices. implemented or maintained by the defendants which, if proven at trial, would violate the FLSA's compensation requirements. The affidavits submitted by plaintiffs and potential members of the class go beyond their own circumstances, and specifically allege personal knowledge that each policy or practice was applied to other employees. Indeed, defendants do not dispute that all relevant employees would be similarly situated insofar as being required to use the same centrally implemented computer program (the "Kronos" system") to measure hours worked and meal breaks. Nor do defendants dispute that the Galyan's version of the Kronos system automatically deducted a meal break from an employee's compensable time whether or not the employee took the meal break or was interrupted during the meal break. The policy, plan or practice at issue then for both DSG and Galyan's is whether defendants condoned, accepted or encouraged managers and employees to illegally reduce compensation for time spent working.

Evidence of such a policy or practice has been made here. The affidavits submitted by plaintiffs are from employees who have first-hand knowledge of how the defendants implemented or adjusted the Kronos program or paid overtime compensation. The affidavits submitted cannot be dismissed summarily as unsupported speculation or conjecture. Indeed, five of the affidavits submitted were from former employees who held *managerial* positions with the defendants, positions that would reasonably allow them to gain knowledge of defendants' policies and practices with respect to implementing the Kronos software, manually adjusting wage and hour entries, training given to managerial employees and hourly workers, lunch break practices and requirements, staffing practices and corporate policies. That the offending practices alleged in the affidavits were factually similar in various store locations in different states throughout the country (and for relatively long periods of time) only serves to reinforce the conclusion that plaintiffs have met their minimal burden of showing company-wide practices or policies for which employees in the classes alleged would be "similarly situated."

The defendants' response to plaintiffs' application is essentially two-pronged. First, defendants submit affidavits from current employees that contradict or at least challenge many of the observations and conclusions contained in the affidavits of the former employees that were submitted by plaintiffs. Defendants' affidavits also present facts which are undoubtedly intended to impugn the veracity and credibility of the former employees. *See, e.g.,* Falce Affidavit at pages 10–14. Defendants' submissions are misplaced at this juncture of the litigation. It is not the Court's role to resolve factual disputes, decide substantive issues going to the ultimate merits or make credibility determinations at the preliminary certification stage of an FLSA collective action. *See Trezvant v. Fidelity Employer Services Corp.,* 434 F.Supp.2d 40, 43 (D.Mass.2006)("[a]t this stage, courts do not need to make any findings of fact with respect to contradictory evidence presented by the parties or make any credibility determinations with respect to the evidence presented")(internal quotation and citation omitted); *Scott v. Heartland Home Finance Inc.,* 2006 WL 1209813, *3 (N.D.Ga. May 3, 2006)(in deciding a motion to authorize a collective action, court need not "resolve factual issues"); *Kalish v. High Tech Institute, Inc.,* 2005 WL 1073645, *2 (D.Minn. April 22, 2005)(so long as a "colorable basis" for the claim exists, court need not make any credibility determinations at the initial FLSA certification stage).

Second, defendants argue that the policy and practices plaintiffs complain about are inherently individualized, fact intensive determinations which do not lend themselves to collective inquiry. Defendants claim that the factual findings that would be required to determine how the automatic deduction policy or lunch break interruption practice or comp time policy affected each class member render the case inappropriate for treatment as a collective action.

■ To a significant degree, however, defendants' arguments put the "cart before the horse." At this stage, the Court is deciding only that plaintiffs have met their modest burden of showing a "colorable basis" for their claims that these company-wide practices exist and, therefore, notice to *potential* class members is appropriate. I am not deciding whether plaintiffs have demonstrated such practices or policies in fact do exist, or, if they do, whether the employees who "opt in" are in fact similarly situated to their purported class. Moreover, the Court does not agree with defendants that the determination as to whether the company has condoned or implemented the company-wide practices alleged by plaintiffs is necessarily contingent on a factually disparate and wholly individualized "case by case" decision making process. But even if defendants' position proves true, that does not mandate denial of preliminary certification at this point in the litigation. As one court has explained:

> Perhaps the investigation and analysis required to determine whether particular options are similarly situated, so as to fairly proceed to judgment in a collective action, ultimately will prove to be sufficiently unwieldy or cumbersome that a collective action will not be appropriate in some or any form. But that does not, under relevant caselaw, mean that notice may not fairly issue under the more lenient step one FLSA analysis.

*Gambo v. Lucent Technologies, Inc.*, 2005 WL 3542485, \*6 (N.D.Ill. Dec. 22, 2005). *See also Mendez v. Radec Corp.*, 232 F.R.D. 78, 92 (W.D.N.Y.2005)(individualized inquiries relating primarily to the issue of damages and not to the main issue of whether the defendants "maintained and applied certain uniform, across-theboard policies that violate the FLSA" do not make case ineligible for FLSA class certification).

This Court is cognizant of the size of the proposed opt-in class and the impact notification may have on defendants. At the conclusion of oral argument of the instant motions, the Court suggested, and the parties agreed to consider, a proposal to limit the stage one conditional certification to an agreed upon sampling of defendants' stores with notice and discovery limited to the pool of stores agreed upon. In return for plaintiffs agreeing to a limited notice and discovery, the Court recommended that defendants agree to toll the statute of limitations for all un-noticed potential class members until a "stage two" determination is made. In stage two, the district court would have the benefit of all the discovery and be able to engage in a detailed inquiry into the veracity of plaintiffs' allegations that all putative claimants are similarly situated and then, if necessary, define the scope and parameters of the FLSA collective action. Depending on the results of the stage two determination, notice could be sent to the members of the class as determined by the court. Eventually, the parties notified the Court that they were unable to agree on the details and, therefore, rejected this proposal.

■ While I still think my proposal makes sense for both plaintiffs and defendants, I do not believe I have the authority to require it. Nevertheless, I believe the

Court *does* have the authority to limit post-notice discovery to a reasonable sampling of defendants' stores or to a limited number of regions. *See Smith v. Lowe's Home Centers, Inc.,* 236 F.R.D. 354, 357–358 (S.D.Ohio 2006)(limiting discovery in FLSA action to a representative sample of the opt-in plaintiffs was appropriate under Rule 26 of the Federal Rules of Civil Procedure).

### Conclusion

For the foregoing reasons, plaintiffs' motions to amend their complaint, to compel discovery of employees who meet the class descriptions and for expedited notice to affected employees are **granted.**[2] Counsel shall appear for a conference with this Court on **October 11, 2006 at 2:30 p.m.** to discuss the scope and procedures to be followed in Stage One discovery, determine the representative sampling pool and to establish a mutually acceptable scheduling order for the Stage One discovery process.

**SO ORDERED.**

**2.** Although defendants opposed the scope of the class to which plaintiffs sought to send the notice, defendants did not object to the notice itself. Therefore, the proposed notice submitted by plaintiffs is hereby approved.